THE PEOPLE v. EDWIN J. CASE AND FRANK B. SHELP.

*Criminal law—Liquor traffic—Sufficiency of information—Unwilling witness—Examination—Impeachment—Evidence.*

1. The omission of the word "liquors" from an information charging the respondent with failing to keep his saloon, where spirituous, brewed, fermented, and intoxicating [liquors] were sold at retail, closed on Sunday, said word appearing in the complaint, warrant, and recognizance certified to the circuit court by the examining magistrate, should be disregarded as a cleri-

cal error, which the record furnishes the means of correcting.

2. Where, on the trial of a criminal case, it appears that a witness whom the prosecuting attorney is required by law to call is an unwilling witness, and adverse to the prosecution, it is not error to permit the prosecuting attorney to read to the witness his deposition taken before the examining magistrate, and interrogate him in relation to the statements made therein.

3. The respondent was confronted by the witness on the preliminary examination, and cross-examined him at length. And it is held that the constitutional provision that a respondent in a criminal case shall be confronted by the witnesses against him was not violated.

4. A contrary statement contained in the deposition could not be used as substantive evidence of the fact so stated, the only effect of the impeachment, if permissible, being to eliminate the testimony of the witness from the case.

5. The introduction by the prosecuting attorney of the warrant and return of the examining magistrate was proper, though not necessary, said instruments being a part of the proceeding, and every juror being presumed to know that a certificate of probable cause is usually necessary to such proceedings.

Error to Shiawassee. (Wisner, J.) Argued February 28, 1895. Decided April 16, 1895.

Respondents were convicted of keeping their saloon open on Sunday, and sentenced to imprisonment in the Detroit House of Correction for 65 days. Judgment affirmed. The facts are stated in the opinions.

*A. L. Chandler* and *M. W. B. Wixom*, for respondents.

*Frank H. Watson*, Prosecuting Attorney, for the people.

HOOKER, J. The defendants were convicted of a violation of the liquor law, the specific charge in the information being that they, "being then and there keepers of a saloon    *    *    *    where spirituous, brewed, fermented, and intoxicating ——— were sold at retail, and said 21st day of January, 1894, being the first day of the week, commonly called Sunday, did not keep the said saloon closed," etc.

No mention was made of the omission of the word "liquors" at the trial, the first time that it was brought to the attention of the court being at the time of the settlement of the bill of exceptions. Error is assigned upon it. In an indictment this would be a fatal defect. There would be nothing upon the face of the proceedings to show that liquors had any connection with the case, and the indictment would contain the only reliable evidence of the nature of the offense found by the grand jury to have been committed. The indictment precedes and is the foundation of action by the grand jury. In proceeding by information the practice is different. The information is not filed until an investigation and determination of the charge by a magistrate have been had. The complaint and warrant are returned with his certificate to the circuit court. The information must accord with them in substance. If it does not, it will be quashed and a new one filed, or it may be amended before trial, and in some cases it has been amended during the trial. It stands at common law on different grounds from an indictment. See 1 Bish. Cr. Proc. § 714, and authorities cited; 1 Enc. Pl. & Prac. 696. In the case before us the complaint, warrant, and recognizance contained the word, and the court should have permitted an amendment had it been asked. There was no possible injury to the defendants, and its omission should be disregarded as a clerical error, which the record furnished the means of correcting. How. Stat. § 9535; *People v. Schultz*, 85 Mich. 114; *People v. Perriman*, 72 Id. 184; *People v. Smith*, 94 Id. 644; *Byrnes v. People*, 37 Id. 515; *Gamblin v. State*, 45 Miss. 658.

The complaint was made by a woman, who claimed that her husband, Mr. Hovey, procured liquor from defendants' saloon upon the Sunday in question. Mr. Hovey was a witness upon the trial, and manifested an indisposition or inability to testify with the same degree of positiveness that he manifested upon the examination. The prosecutor claimed the right to ask leading

questions, upon the ground that he was an adverse witness; and the court seems to have been impressed with the fact that he was an unwilling witness, to say the least. The witness was asked by the prosecuting attorney:

"*Q.* Did you go to this saloon that day?

"*A.* Don't know whether I did or not, for certain.

"*Mr. Watson:* I desire to read this man's evidence that was taken in justice's court. Then I desire to have the court give some instructions in the case.

"*Mr. Chandler:* I object to its being read.

"*The Court:* This witness must tell what he knows about this case. If the court becomes convinced that he is not telling what he knows, he will have him in prison when the time arrives, if I am convinced he is not telling all he knows about this case.

"*Q.* Were you there on the 21st day of January, 1894, at that saloon?

"*A.* I think I was. I think I was in town. Yes, sir; I was in town.

"*Q.* Were you at their saloon?

"*A.* I don't want to swear positively that I was in there, because I was on a spree.

"*Q.* Didn't you swear positively in justice's court?

"*A.* I might have.

"*Q.* Was it true?

"*A.* I am not going to say.

"*Q.* I ask whether what you swore to in justice's court was true?

"*A.* To my best recollection, it was.

"*Q.* That was within a few days after this took place?

"*A.* I think it was.

"*Q.* Did you swear there that you were.at that saloon on the 21st day of January? [No answer.]

"*Q.* Is that your signature? [Testimony in justice's court shown witness.]

"*A.* Yes, sir.

"*Q.* That testimony was read over to you?

"*A.* I think it was.

"*Q.* You heard it all.

"*A.* Yes, sir; I think I did.

"*Q.* Did you there at that time swear like this: 'They kept a saloon. It was located on the south side of the street running east and west in Bancroft, Shiawassee

county.' [Objected to as incompetent, immaterial, and improper. Objections overruled, and defendants excepted.]

"*The Court:* He can read it, and ask the witness if he so testified."

The prosecutor thereupon read the entire deposition of this witness taken upon the examination, and he was examined upon it. The deposition was a positive statement of facts, free from expressions of doubt, and gave the circumstances in detail.

If the record shows all that occurred upon the trial, we have failed to discover it, and we are unable to say that the court was not justified in his apparent conclusion that the witness was quibbling. The judge said nothing of the kind, but seems to have thought it necessary to inform the witness of what he might expect if he became convinced that he was refusing to tell all that he knew. This was dangerous ground, by reason of its implication, but it was not objected to, nor was any exception taken.

The next important question is that relating to the reading of the deposition. We are impressed, as the circuit judge was, that the witness was unwilling to testify. His deposition contained unqualified testimony of violation of the law, upon the Sunday mentioned, by repeated sales. If it was not a case of the people's witness attempting to avoid testifying against a defendant, it certainly justified that claim upon the part of the prosecution. Whether it was caused by collusion or was voluntary we need not consider. The important question is whether the public has any relief in such cases, and, if so, what it is. The witness was one whom the prosecutor was required by law to call. It has been held that a party might even impeach an adverse witness by showing a bad reputation for truth and veracity, when the witness was one whom the party must call; *e. g.,* a subscribing witness to an instrument. 1 Greenl. Ev. § 443, and cases cited. The reason usually given for

the rule that a person cannot impeach his witness is that he is presumed to know his character, and that by calling him he represents him as worthy of belief. 1 Greenl. Ev. § 442. And the court, in *Com. v. Welsh*, 4 Gray, 535, went so far as to hold that such witness, who on direct examination testified that he did not know certain facts, could not be asked if he did not on a former occasion testify to them. But in *Rex v. Oldroyd*, Russ. & R. 88, it was held that a party might contradict his witness by reading her former deposition. Mr. Greenleaf states that there is a diversity of opinion upon this subject, but that—

"The weight of authority seems in favor of admitting the party to show that the evidence has taken him by surprise, and is contrary to the examination of the witness preparatory to the trial, or to what the party had reason to believe he would testify, or that the witness has recently been brought under the influence of the other party, and has deceived the party calling him; for it is said that this course is necessary for his protection against the contrivance of an artful witness, and that the danger of its being regarded by the jury as substantive evidence is no greater in such cases than it is where the contradictory declarations are proved by the adverse party." See 1 Greenl. Ev. § 444, and note 2 (13th ed.).

These are cases where the party voluntarily called the witnesses, and may reasonably differ from cases where they must be called. Our attention has not been called to a case where a subscribing witness called by the prosecution has been impeached by the prosecuting officer, but no good reason suggests itself why this rule should not be as applicable to criminal as to civil cases. The only effect of the impeachment would be to eliminate the testimony of such witness. A former contrary statement could not be used as substantive evidence of the fact so stated. See *McClellan v. Railway Co., post*, 101, where the authorities are collected. If this practice is permissible, we see no difference in principle

between such a witness and any other witness whom the people are bound to call. But impeachment was not attempted here. An attempt was made to overcome the witness' disinclination to divulge, by confronting him with his former statements, not made privately, but taken in the form of testimony, subscribed and under oath. See *Beaubien v. Cicotte,* 12 Mich. 486.

The only other objections to this are that the jury might take the former testimony as substantive evidence against the defendant, and that the Constitution requires that a defendant shall be confronted by his witnesses. As to the first of these there is no more danger than in any case of impeachment, and a request to charge would have protected the defendants. To the second objection there is no force, for the defendants were confronted by and cross-examined this witness at length upon the examination, and this has been held sufficient to permit the introduction of the testimony to prove substantive facts where the witness was dead. This testimony was not received for that purpose, if it can be said, legally and technically, to have been received at all, within the meaning of this constitutional provision. It was read to the witness as a basis of interrogation merely. To say that a defendant could not cross-examine most rigidly an adverse witness upon his former statements and depositions would be a great hardship, and there can be no difference between the defense and the prosecution in this respect, unless it be a possible difference growing out of the constitutional provision mentioned. If the propriety of the practice be once established, then it would seem to be the right of the witness to have the whole writing read. *Lightfoot v. People,* 16 Mich. 507; *People v. Sweeney,* 55 Id. 591. We think the record fails to show that error was committed in permitting the reading of this testimony.

The introduction of the warrant and return was proper, though not necessary. They were part of the proceeding. Every juror will be presumed to know that a cer-

tificate of probable cause is usually necessary to such proceedings. It is not shown that improper use was made of these papers.

Complaint is made of language of the prosecuting attorney. Upon the face of the record, we might be justified in saying that abstractly one or more of his remarks to the jury were uncalled for; but we have no means of knowing whether or by what they were provoked, and, as we have frequently said, ordinarily these things must be left to the trial judge to deal with.

The judgment of the circuit court will be affirmed.

Long and Montgomery, JJ., concurred with Hooker, J.

McGrath, C. J. (*dissenting*). The prosecuting attorney, in addressing the jury in this case, made use of the following language:

"In considering a case, it is not expected that we are going to throw aside our knowledge as men, and you know that this Sunday trade is peculiar. And it is only when some person gets mad that the proof can be obtained, and because high-toned, respectable men do not go there, especially when they have to sneak in at the back door; and such as are there would sooner swear for their saloon-keeper than for their minister or their wife. You nor I never found a saloon-keeper yet who, when arrested for keeping open after hours or upon Sunday, would not go upon the witness stand and swear positively that it was not open at all, and get all the suckers he wanted to testify for him."

There had been a horse trade between one Hovey and defendant Case. The complaint was made by Hovey's wife. She says:

"*Q.* You may tell the jury whether or not if this complaint would have been lodged against the men who kept the saloon if they had not injured your husband or you in a horse trade in some way.

"*A.* Well, I don't know. I had threatened it all summer.

"*Q.* Didn't you state to them, if they traded back horses and delivered up the note, if they didn't do that, you would have them pulled?

"*A.* I told them, if they would bring back the horse and the $9.50 note, that I would not.

"*Q.* And, if they didn't bring the horse back and the $9.50 note, that there would be a complaint made against them?

"*A.* Yes, sir.

"*Q.* They didn't bring it back?

"*A.* No, sir.

"*Q.* So the complaint was made?

"*A.* Yes, sir.

"*The Court, to Witness:* Did you say that you had been threatening to make a complaint all summer?

"*A.* Yes, sir.

"*Mr. Watson:* You went down there after your husband came home drunk on this Sunday? You say you had been threatening to have them arrested for selling him liquor?

"*A.* Yes, sir.

"*Q.* You went down after he came home drunk on Sunday?

"*A.* Yes, sir.

"*Q.* And saw West?

"*A.* No, sir; Shelp.

"*Q.* And had a conversation with him? Now, what was that conversation?

"*A.* I called him out, and I told him that that horse trade and liquor had made quite a bit of trouble, and I was going to make it better or worse, and wanted them to have the horse back there the next morning and the $9.50 note, or I would have them arrested for selling liquor on Sunday. He said he didn't know, and I says, 'You did no longer ago than last Sunday,' and he said they would not do it again."

Shelp denies this. The only other witness called by the people was the husband, who, upon the examination before the justice, had testified that himself, both of the proprietors, and seven other persons, naming them, were in the saloon on the Sunday in question. He also stated that, before the complaint was made, his wife had threatened to have defendants arrested because of the horse trade, and that "she told me that she had told Case, if he did not return the horse, she would pull the saloon." On the trial in the circuit, both proprietors

testified that the saloon was not open on the Sunday in question, and each of the seven persons testified that he was not in the saloon on that day. There was absolutely nothing brought out upon the trial affecting the credibility of a number, if any, of these witnesses. In view of the testimony tending to show a motive for the complaint, the character of the people's principal witness, and the testimony of nine persons contradicting the people's principal witness on the material point in the case, it is inconceivable that the defendants should be found guilty, unless the jury were influenced by the prosecuting attorney's remarks, which were without support in the record. So far as the witness Hovey was concerned, in view of the animus of the complaint, the most reasonable theory was that he did not tell the truth at the preliminary examination.

I think that, upon this record, defendants should be granted a new trial.

GRANT, J., did not sit.