SMITH *v.* SMITH, STURGEON & CO.[1]

1. WITNESSES—CONTRADICTION.

A party, at law or in equity, may contradict, though he cannot impeach, his own witness.

2. CORPORATIONS—REORGANIZATION—"FREEZING OUT" MINORITY STOCKHOLDERS—FRAUD.

Complainant, a creditor of one of two firms which were consolidated as a corporation, accepted as collateral security for her debt certain stock in the corporation. Subsequently the corporation was reorganized by agreement between H., a creditor thereof, and its directors, by which H. assumed all the liabilities of the corporation, and obtained its assets. Two of the directors of the old corporation were placed in the management of the new one, and the same number of shares which they had in the old corporation were issued to them in the new, apparently without any consideration. *Held*, that complainant was entitled to a personal judgment against the two directors of the old corporation, and the purchaser of the assets thereof, for the amount of her claim, and to a lien for the same on the assets of the new corporation, since the stock issued to the two directors without consideration should be treated as assets of the old corporation.

[1] Rehearing denied February 27, 1901.

3. SAME—PLEDGEE OF STOCK—RIGHT TO COMPLAIN.
    The fact that complainant held the stock only as security for
    her debt did not deprive her of the right to relief, on the
    theory that the owners of the stock were alone entitled to call
    the directors to account, as complainant had an interest to
    the amount of her claim in the stock pledged to her, and
    indirectly in the assets of the corporation.

Appeal from Wayne; Waite, J. Submitted October 10, 1900. Decided November 13, 1900.

Bill by Mira J. Smith against Smith, Sturgeon & Company, Martin S. Smith, 2d, Frank G. Smith, Jr., Charles F. Hammond and Charles E. Dorr, trustees, William A. Sturgeon, Charles E. Dorr, Charles W. Hayes, Edward Holbrook, and W. A. Sturgeon & Company, to set aside a transfer of corporate assets. From a decree dismissing the bill, complainant appeals. Reversed.

*William B. Daniels* (*Frank E. Robson*, of counsel), for complainant.

*Warner, Codd & Warner*, for defendants.

HOOKER, J. Mira J. Smith, the complainant, was a creditor of F. G. Smith & Sons to the amount of $5,206.29, upon a promissory note, upon which there was due $6,638.01 at the time of the hearing of this cause in the circuit court. Frank G. Smith, Jr., and Martin S. Smith, 2d, gave her in pledge, to secure the payment of this note, 750 shares of the capital stock of a corporation named Smith, Sturgeon & Co., which was formed by a consolidation of the business of F. G. Smith & Sons and Sturgeon & Co., both of which concerns had been theretofore engaged in the jewelry business at Detroit. The stock remained in their names upon the books of the company. The new corporation (Smith, Sturgeon & Co.) was capitalized at $100,000, but only 7,500 shares, of $10 each, were issued. These 7,500 shares were divided between the two old firms as follows: The F. G. Smith & Sons

stock was turned in at $86,588.25, upon which Frank G. Smith, Jr., and Martin S. Smith, 2d, received 2,500 shares of stock. The remainder of the $86,588.25 was paid by the promissory notes of Smith, Sturgeon & Co. The stock of Sturgeon & Co. was put in at $59,154.53, and was paid for by 5,000 shares of stock in the new company, and its promissory notes for the remainder. Said 5,000 shares were issued, 4,250 shares to Charles F. Hammond, and 750 shares to W. A. Sturgeon. Two thousand five hundred shares remained in the treasury of Smith, Sturgeon & Co.

When organized, Smith, Sturgeon & Co. had a board of four directors,—Hammond, Sturgeon, F. G. Smith, Jr., and M. S. Smith, 2d. Among the obligations outstanding against Smith, Sturgeon & Co. was one of $42,000, represented by promissory notes given to M. S. Smith, 1st. Hammond relieved the company from embarrassment by the purchase of this paper, and raised money for it upon his credit to the amount of $20,000. His *claims* aggregated $74,000 on October 4, 1897. Among its other liabilities was one to the Gorham Manufacturing Company, of which company Holbrook was later, and possibly at the time, president, and Dorr was an employé; *i. e.*, a traveling salesman. Hammond sold his interest to Dorr, and their agreement, dated October 4, 1897, to which the company was a party, provided, in substance, that Dorr should purchase Hammond's 4,250 shares of stock for the sum of $12,500 in cash; 3,000 of said shares to be retained by Hammond in trust for Dorr. Smith, Sturgeon & Co. promised to execute to Hammond its promissory note or notes amounting to $74,000, which notes Dorr and Sturgeon agreed to indorse; and it was further agreed that, upon the delivery of said notes, Hammond should surrender to Smith, Sturgeon & Co. its then outstanding obligations, amounting to $74,000. The 3,000 shares of stock were to be held by Hammond as security for the payment of the new notes, which were to be indorsed by Dorr, and the stock was to be transferred to Dorr upon such payment

being made.  It was also agreed that Hammond should have such representation upon the board as he should see fit during the time that said indebtedness should exist. The Smiths retired from the board of directors in January, 1896.  Mr. North Willcox then became a director, and remained so until 1898, when Mr. Hayes took his place. Hammond retired in 1898, and Dorr took his place.  During 1899, until July of that year, Dorr, Sturgeon, and Hayes constituted the board of directors.

In March, 1899, the directors and Holbrook, whose company, the Gorham Manufacturing Company, was a creditor to a large amount of Smith, Sturgeon & Co., began negotiations with a view to the purchase by Holbrook of the assets of Smith, Sturgeon & Co.  Hammond was a party to the transaction.  On July 18, 1899, the deal was closed.  Holbrook was to receive all of the assets and pay all of the debts of Smith, Sturgeon & Co.  This arrangement was made under a resolution alleged to have been adopted at a directors' meeting, and ratified subsequently by meeting of the stockholders of Smith, Sturgeon & Co. This arrangement between the directors and Holbrook hinged upon an agreement between Hammond and Holbrook whereby Hammond agreed to transfer to Holbrook the M. S. Smith notes, said to amount at that time to $54,000, and to reassign to Dorr the 3,000 shares of stock held in trust, and Holbrook agreed that, after the proposed deal should be ratified by the stockholders, he would pay to Hammond $18,000 in cash, and cause to be issued and delivered to Hammond the sum of $4,000 in the stock of the reorganized company which was contemplated, and would pay two notes of Smith, Sturgeon & Co., of $5,000 each, held by the Commercial National Bank, and that he would assume and pay the entire outstanding indebtedness of Smith, Sturgeon & Co.  This arrangement was in part carried out, and Sturgeon and Dorr took, or, more properly speaking, remained in, control of the property for Mr. Holbrook.  When the company was reorganized, it was upon the following basis:  Mr. Warner, who was

Holbrook's attorney in the transaction, says that he advised how the reorganization should be effected, what name should be used, and how the capital should be subscribed. The name was made W. A. Sturgeon & Co. To determine the amount at which the capital stock should be fixed, so that it could be said to be in good faith paid in, he took $90,967, now said to be the indebtedness of Smith, Sturgeon & Co., which he regarded as being represented by assets which Mr. Holbrook turned into the company. Stock to the amount of $12,500 was issued to Dorr, and $7,500 to Sturgeon. Holbrook took the rest, except $4,000, which was issued to Hammond as per the agreement already mentioned. Thus Dorr and Sturgeon came out of the transaction with the same amount of stock that they had in the old company, while other stockholders received none. That is not all. Such stock was confessedly worth par, while we are asked to believe that the stock in the old concern was worthless.

The defendants contend that the record shows that the business of Smith, Sturgeon & Co. was a failing business, and that it was imperatively necessary that some change be made if its creditors were to be paid; and they claim that it was within the power of the board of directors to sell all of its assets to accomplish the payment of its debts. If that be conceded, the fact remains that the directors have no right to profit out of such sale. The testimony shows that, while all of the other stockholders lost their investments, Sturgeon and Dorr saved theirs, for they obtained, without cost, the same number of shares in the new corporation, admittedly worth par, that they had in the old; and it requires a degree of credulity that we do not possess to justify the belief that this was a voluntary gift from Holbrook, after his purchase, and not understood and arranged for in advance.

It is said that the testimony of Sturgeon and Dorr must be taken as true, and that, because the complainant has made them her witnesses, she cannot question their statements. That doctrine has been repeatedly urged upon us,

and as often denied.    We have consistently and uniformly
held that while such a witness, like any other called vol-
untarily, may not be impeached by the party calling him,
his testimony may be contradicted.    *Darling* v. *Thomp-
son,* 108 Mich. 215 ( 65 N. W. 754); *People* v. *Case,* 105
Mich. 97 ( 62 N. W. 1017 ).

In this case the claim that this was a gift is inconsistent
with the circumstances established in the case.    They are
more consistent with the theory of an arrangement to so
manipulate the property as to save the interest of some
stockholders, at the expense of others, by a process com-
monly called "freezing out" the minority stockholders,
and a reproach upon modern business methods, and which
the law forbids, but does not in all cases effectually pre-
vent.    In the face of such results, an abiding faith in the
integrity of a transaction is not to be expected from those
conversant with the circumstances, although strenuously
asserted by the parties who reap the harvest of spoils.
Some of the circumstances throwing light on this transac-
tion may be mentioned.    In February, 1899, these same
directors took an inventory of the property, and it amounted
to $166,000.    In July they took another, making it $116,-
000, in round numbers.    They and Hammond at all times
were willing to treat the Smith indebtedness in the hands
of Hammond as $42,000, although they had been advised
that the company was entitled to the benefit of the dis-
count of $21,000 which Hammond obtained.    Apparently,
Holbrook claimed, and the directors were willing to con-
cede, that this was a valid claim against the old concern
for every purpose except a reorganization.    It was used
to swell the indebtedness when it was sought to convince
stockholders that it was good policy to sell to Holbrook.
Again, Holbrook may be presumed to be a sagacious busi-
ness man, if business success is a test.    He had seen this
business fail under the management of Sturgeon and Dorr,
yet it is urged that he considered their future manage-
ment so essential to the success of the new company, of
which he was substantially the sole owner, that he made

them a gift of $20,000 out of a capital of $66,000 to secure it. Passing by all claims that the second inventory was fraudulently low, and that the embarrassment was largely due to the insistence of Holbrook that the $15,000 claim of the Gorham Manufacturing Company should be paid, as well as the pre-existing relations between him and Dorr, the fact that these directors were able to negotiate a disposition of the assets so as to reap a profit therefrom is painfully clear. Granting that they might lawfully dispose of the assets and pay the debts, they, as faithful officers, were bound to account for any surplus that they might be able to save.

It is said that the complainant is not in a situation to claim any relief; that the owners of the stock, only, are persons to whom an account is due from these directors. The complainant has an interest to the amount of her claim in the stock of Smith, Sturgeon & Co., and indirectly in its assets, which alone give value to her security. She may ask equity to protect that right from destruction. Manifestly, she has no interest in the matter further than the amount of her claim against the Smiths, which she holds the stock to secure. But the Smiths are parties to the record, and have answered, and asked the benefit of complainant's proceedings. There is therefore no impediment to giving full relief to all parties in interest.

The decree of the circuit court must be reversed. We think it unnecessary to go further than to hold that the par value of the stock issued to Dorr and Sturgeon, with interest, must be treated as assets of Smith, Sturgeon & Co., and that the Smiths shall be paid their respective shares, less the amount of the complainant's claim, which shall be paid to her; that, as Holbrook participated in the arrangement under which such stock was issued, the decree for the payment of said sum will be personal against him, as well as against Sturgeon and Dorr, for the full amount, and the costs of both courts, and the same shall be a lien upon the assets of Sturgeon & Co.

The other Justices concurred.