## SPARROW v. E. BEMENT & SONS.

1. CORPORATIONS—REORGANIZATION—FRAUD AGAINST STOCKHOLDERS.

    Where a sale of the entire property of a corporation to a new corporation composed of the directors of the old one and organized to take over its assets was in fact fraudulent as to a minority stockholder of the old corporation, the fact that the transfer of assets was accomplished through the agency of valid mortgages, regularly enforced, is immaterial.

2. SAME—DIRECTORS—FIDUCIARY RELATION.

    The directors of a corporation are not entitled to make a profit for themselves as promoters at the expense of the minority stockholders by organizing a new corporation and without further investment taking over the assets of the old one by foreclosing trust mortgages given to one of themselves.

3. SAME—RIGHTS OF PREFERRED STOCKHOLDERS.

    Where, after a reorganization and transfer of assets of a corporation, a preferred stockholder is given to understand that his stock is recognized as still existing and he is notified that he is still a stockholder and entitled to participate in the meetings of the company, the two corporations are identical

as far as that stockholder's rights are concerned, and any attempt thereafter to deprive him of his stock amounts to a legal fraud.

4. SAME—STOCKHOLDER'S RIGHTS—ENFORCEMENT—PARTIES.

Where a stockholder files a bill to enforce his rights against a new corporation, formed to take over the assets of the corporation in which complainant was a stockholder, the stockholders of the new corporation, against whom no relief is sought, are not necessary parties.

5. APPEAL—ERRORS REVIEWABLE—NECESSITY OF OBJECTIONS BELOW.

The objection that stockholders in a corporation are necessary parties to a suit against the corporation should be raised upon the hearing below, and will not be sustained on being raised for the first time in this court, where, since the decree below, the corporation has been dissolved and its property placed in the hands of a receiver.

Appeal from Ingham; Smith (Clement), J., presiding. Submitted October 3, 1905. (Docket No. 1.) Decided December 30, 1905.

Bill by Edward W. Sparrow against E. Bement & Sons and E. Bement's Sons to set aside a transfer of corporate assets. From a decree for complainant, defendants appeal. Modified.

*Rollin H. Person*, for complainant.

*Cahill & Wood*, for defendants.

BLAIR, J. The defendant corporation, E. Bement & Sons, hereafter called the "old company," was organized in 1887, and carried on its business of manufacturing agricultural implements, bobsleds, and stoves from that time until October 11, 1897, when it ceased to do business, and thenceforth its business has been carried on by the defendant corporation, E. Bement's Sons, hereafter called the "new company." The officers of the old company during its entire life were A. O. Bement, president, G. W. Bement, secretary and treasurer, C. A. Gower, vice

president, and C. E. Bement, superintendent.   Mr. A. O.
Bement was the general financial manager, and H. S.
Bartholomew was sales manager.   The gentlemen named,
together with Mr. Molitor, for a part of the time, com-
prised the directors of the company during the period
mentioned.   The capital stock of the old company was
divided into 35,000 shares of common and 15,000 shares of
preferred, of the par value of $10 per share.   Of the common
stock, A. O. Bement held 11,534 shares; G. W. Bement,
10,532; Clarence E. Bement, 5,265; C. A. Gower, 5,265;
H. S. Bartholomew, 674; and Mr. Molitor, 1,709.   Of
the preferred stock, 2,900 shares were issued, of which the
complainant held 650 shares; The Lansing State Savings
Bank, 500 shares; Mr. Thoman, 300 shares; Charles La
Dow, 500 shares.   J. S. Johnson, of New York City, L.
S. Wilcox, of Detroit, and a Mr. Burky, of Grand Rapids,
were the other holders of preferred stock, but in what pro-
portions the record does not disclose.

On the 16th day of May, 1896, the old company, being
unable to meet its obligations as they matured, executed
two sets of mortgages—one real estate and one chattel
mortgage, covering the property of the company, to its
attorney, Edward Cahill, in trust, to secure payment to
the home creditors of the sum of $150,000; and one real
estate and one chattel mortgage, covering the same prop-
erty, to its president, A. O. Bement, in trust for and
securing the payment of about $200,000 to the outside
creditors.   The mortgages to Bement were expressly
made subject to the mortgages to Cahill.   The mortgages
to Cahill were accepted by all of the creditors secured
thereby, and the mortgages to Bement were accepted by
nineteen-twentieths of the creditors secured thereby.
The acceptances of the mortgages to Bement were evi-
denced by agreements with the several creditors, contain-
ing, among others, the following covenants:

"That   *   *   *   will accept and receive in full pay-
ment, satisfaction and discharge of   *   *   *   indebted-
ness against E. Bement & Sons, the bonds of E. Bement

& Sons, its successors and assigns, for fifty per cent. of the face value of  *  *  *  indebtedness against E. Bement & Sons, which bonds shall be of the same issue as those issued to the holders of the first mortgage indebtedness, and are to bear interest at six per cent. from Oct. 1, 1897, payable quarterly, which said bonds shall be payable, five per cent. the first year, five per cent. the second year, five per cent. the third year, ten per cent. the fourth year, and the balance the fifth year.  Said bonds shall be secured by mortgages covering all of the real and personal estate of the said E. Bement & Sons, now covered by the mortgages to Edward Cahill and Arthur O. Bement, trustees, and all substituted or after-acquired property; said existing mortgages to be canceled.  *  *  *

"For the remaining fifty per cent. of its claim, to receive the full paid stock of E. Bement & Sons *or of such corporation as may hereafter be organized as the successor of E. Bement & Sons, if such reorganization shall be deemed advisable.*  The amount of the stock to be issued in any such corporation, including the stock already issued or owned by any of the present stockholders of E. Bement & Sons, shall not exceed the total net bona fide assets of E. Bement & Sons, and in no case to exceed the sum of five hundred thousand dollars.  *  *  *

"The said E. Bement & Sons, for themselves, their successors and assigns, do hereby covenant and agree to and with the said part  *  *  *  of the second part, with all reasonable dispatch and without fraud or delay to bring about an adjustment and funding of their indebtedness upon the plan hereinbefore set forth, as near as may be, and that they will, on or before the 1st day of October, 1897, or within such reasonable time thereafter as due diligence upon their part will permit, execute, or cause to be executed, bonds in an amount not exceeding one hundred and sixty thousand dollars secured by mortgages upon *the real and personal property now or hereafter to be owned by E. Bement & Sons, their successors or assigns*, conditioned for the payment of the indebtedness hereinbefore referred to, to the amount of the said one hundred and sixty thousand dollars, at the time and in the manner hereinbefore provided, together with interest thereon at six per cent. payable quarterly from said first day of October, 1897, and will deliver to said part  *  *  * of the second part such amount of said bonds as shall be sufficient to pay fifty per cent. of the face value of its claim.

"And they do further covenant and *agree, for themselves, their successors or assigns,* to execute or cause to be executed and delivered to said part * * * of the *second part full paid stock in the corporation of E. Bement & Sons or of any corporation which shall be organized as its successors,* in an amount equal to fifty per cent. of the face value of * * * claim against E. Bement & Sons not paid in bonds as above provided.

"*In case any considerable number of* the holders of indebtedness secured by the trust mortgages to Arthur O. Bement *shall refuse to accept the settlement herein proposed,* or to participate on that basis in the security to be given upon the readjustment of said indebtedness, *and if it shall in consequence become necessary,* for the holders of the indebtedness secured by the mortgages to Edward Cahill, trustee, *to foreclose* or otherwise enforce such mortgages, then it is agreed that upon a sale of such property or any of it under such foreclosure proceedings, *the same shall,* in the absence of other higher bidders, *be bid in by a committee* to be appointed by the circuit judge of Ingham county, if he will consent to act, and if not, then to be appointed or elected by a majority in interest of the creditors secured by said mortgages to Edward Cahill, trustee, and such creditors secured by the mortgages to Arthur O. Bement, trustee, as shall have accepted the settlement herein proposed, in the interest of all such creditors, *to be by said committee conveyed to E. Bement & Sons, their successors, or assigns,* within three months from such sale, upon the execution and delivery to such committee of trust mortgages covering all of said property and conditioned for the payment of all such indebtedness now secured by the mortgages to Edward Cahill, trustee, and that secured by the mortgages to Arthur O. Bement, for which settlement shall have been made as herein provided, at the time and in the manner herein specified, after the execution thereof, provided said mortgages shall not exceed the sum of one hundred and sixty thousand dollars.

"*After the stock herein provided for shall have been issued to the creditors of E. Bement & Sons, the balance of the authorized full paid stock of such corporation, whether E. Bement & Sons, or of its successors to be hereafter organized, shall be divided among the present stockholders of E. Bement & Sons, pro rata according to their present holdings.*"

It having become certain that several of the creditors would not accept the mortgages, and one of them threatening a levy and sale subject to the mortgages, Mr. A. O. Bement, with the approval of the other directors, on October 4, 1897, took possession of the personal property under his chattel mortgage, and posted notices of sale for the 11th of October ensuing. On the 9th of October, the new company of E. Bement's Sons was organized for the purpose of bidding in the property at the sale. The stockholders of the new company were as follows: A. O. Bement, Cornelius A. Gower, Clarence E. Bement, G. Willis Bement, H. S. Bartholomew, Edwin J. Bement, son of A. O., Howard Bement, son of G. W., Charles A. Gower, son of Cornelius A., and Carrie A. Bement, wife of Clarence E. Bement. On the same day, the following officers were elected: A. O. Bement, president; Cornelius A. Gower, vice president; G. W. Bement, secretary and treasurer; C. E. Bement, superintendent. All of the stockholders were elected directors, except Carrie A. Bement. The capital stock of the corporation was fixed by the articles at $20,000, with a recital that 10 per cent. had been paid in cash. In fact, no part of the capital stock had been paid in, in cash or otherwise. On the day fixed for the sale, the property was bid in by Clarence E. Bement for the new company for $100, as was contemplated when it was organized. On the same day the old and the new companies entered into the following agreement:

"This agreement, made and entered into this 11th day of October, 1897, between E. Bement & Sons, a corporation of Lansing, Michigan, party of the first part, and E. Bement's Sons, also a corporation of Lansing, Michigan, party of the second part—

"*Witnesseth:* The party of the first part, for and in consideration of the sum of five dollars, to it in hand paid, the receipt whereof is hereby confessed and acknowleged, and of the covenants and agreements hereinafter contained, does hereby agree to sell and convey and by these presents does sell and convey, to the party of the second part, all of its real and personal property wherever situate,

and more particularly described in the inventory of said property, made by E. Bement & Sons, in July, 1897, and to which for greater certainty the parties hereto refer: subject, however, to the mortgages upon said property given on May 16, 1896, to Edward Cahill, trustee, and to Arthur O. Bement, trustee, in the order named, and subject, also, to three real estate mortgages on said property given as part of the purchase price.

" The said party of the first part further agrees within thirty days from this date to execute, acknowledge and deliver such proper and legal conveyances of the property herein described as *will convey* to the party of the second part *a good and sufficient title to said property*, real and personal, *free and clear of all liens, mortgages or other incumbrances except as hereinbefore stated.*

" And the party of the second part, in consideration of the foregoing agreement, hereby agrees to purchase, and by these presents does purchase, from the party of the first part, the property described and in addition to the sum of five dollars by them in hand paid to the said party of the first part, the said party of the second part further agrees, as follows :

"*That it will* in good faith and without delay *carry out and perform all the contracts made by the said party of the first part* with its creditors who are secured under the said mortgages given to Edward Cahill, trustee, and Arthur O. Bement, trustee, which contracts provide for the issuing of bonds secured by trust mortgage upon all the property of said E. Bement & Sons, payable: Five per cent. in one year, five per cent. in two years, five per cent. in three years, ten per cent. in four years, and the balance in five years, with interest at six per cent., payable quarterly; that certain of said creditors are to receive said bonds for the entire amount of their indebtedness, and certain other of said creditors are to receive bonds for fifty per cent. of their indebtedness, and stock in the corporation of E. Bement & Sons, or any reorganization of said corporation, for the remaining fifty per cent. of their said indebtedness, and which agreements also provide as to certain of said creditors they shall receive stock in said corporation for the full amount of their indebtedness, and the said party of the second part agrees to carry out all such agreements in good faith to the full intent and purpose for which the same were made by the said E. Bement & Sons, and they further hereby agree to

assume and pay the reasonable and lawful fees of the trustees named in said mortgages of May 16, 1896, and all reasonable and lawful counsel and attorney fees for which E. Bement & Sons are now liable, to assume and perform all contracts entered into by E. Bement & Sons, and pay all indebtedness incurred since May 16, 1896, in the same manner and to the same extent that the said E. Bement & Sons would be liable to perform and pay if this agreement had not been made.

"*That it will cause the capital stock* of the corporation of E. Bement's Sons *to be increased to the sum of five hundred thousand dollars ($500,000) and will issue to each of the present stockholders of E. Bement & Sons stock in the corporation of E. Bement's Sons to an amount equal to their present holdings in the corporation of E. Bement & Sons,* or such pro rata share thereof as shall remain after the stock due to creditors of E. Bement & Sons shall have been duly issued as hereinbefore provided.

"In witness whereof, the parties, by their several boards of directors, have caused these presents to be executed by their several presidents and secretaries the day and year first above mentioned.

"E. BEMENT & SONS,
"By A. O. BEMENT, President,
"And G. W. BEMENT, Secretary.
"E. BEMENT'S SONS,
"By A. O. BEMENT, President,
"And G. W. BEMENT, Secretary."

A. O. Bement took possession of the personal property under his chattel mortgage, and after the sale turned it over to the new company, and from that time on the business went on in the name of the new company. There was no change in the working organization at all. The same officers, superintendent, managers, and employés went right on that had been there, in substance, before. It was intended that the agreement of October 11th should be a transfer of the whole property to the new company under certain conditions. On the 15th of October, for a nominal consideration of five dollars, the old company executed to the new company a quitclaim deed of all of its real estate, having discovered, as claimed by the mutual president,

that the old company could not carry out the condition of the agreement to convey an unincumbered title, except as to the mortgages, within 30 days. This discovery was made through consultation with the attorneys for the levying creditors immediately after the execution of the agreement of October 11th. Mr. A. O. Bement testified:

"It was my intention to see to it that every creditor should get his pay in full, and that all the stockholders of E. Bement & Sons should have common stock for their holdings.

" *Q.* Did you expect to do that as a legal duty, or simply as a gratuity?

"*A.* I intended to do that so there could not be any man say that we hadn't treated every man fairly, not as a legal proposition. I considered it a moral duty.

" *Q.* Was that the view taken by the board of directors of E. Bement's Sons?

"*A.* I don't know as I really sounded them on that subject, but they seemed willing to carry out that agreement.

" *Q.* Did you consider it your legal duty to carry out the agreement of October 11th so far as the creditors were concerned?

"*A.* We did, yes, sir. Legal duty? No, I didn't consider that that agreement as an agreement was legally binding upon the new company; but I did consider, and insisted upon it, that the agreement should be carried out, whether it was legal or not.

" *Q.* At the time you made it, on October 11th, you had intended it for a valid binding contract?

"*A.* Yes, sir; if the other portion of the agreement had been carried out, we would have considered it a binding and legal obligation.

" *Q.* And because they could not get rid of the seven or nine thousand dollars of levying creditors you considered yourself excused from carrying it out?

"*A.* We considered ourselves legally excused; yes, sir.

" *Q.* And you still kept the property that you got by the agreement?

" *A.* Well, we didn't get all we contracted for, nor we didn't get the property as we had contracted. We kept what we got."

At the time of these transactions the complainant was

in Europe, and did not return to the United States until April, 1898.

On the 11th of February, 1898, A. O. Bement, without consulting or notifying the creditors, began the foreclosure of his real estate mortgage, which resulted in a decree for sale of the property December 30, 1899. On July 8, 1900, sale was had, and the property was bid in for the new company by a bid of $101,000. No money was paid or expected to be paid on this bid; the plan being to issue bonds and stock, according to the agreement of the old company with the creditors. The complainant's solicitors, however, receipted for the $101,000 bid, and, on July 21, 1900, a commissioner's deed was executed to the new company. On the 28th day of February, 1898, the directors of the new company filed the following notice with the Secretary of State:

"TO THE SECRETARY OF STATE OF THE STATE OF MICHIGAN:

"Please take notice that the corporation known as E. Bement & Sons, of Lansing, Michigan, has sold at private sale its property and franchises, except so far as the same may be necessary for the closing up of its business, to E. Bement's Sons.

"This notice is given by order of the board of directors of said E. Bement & Sons this 28th day of February, 1898.

"C. A. GOWER,
"G. W. BEMENT,
"H. S. BARTHOLOMEW,
"HOWARD E. BEMENT,
"CLARENCE E. BEMENT.

"Received for record February 28th, 1898."

On the 20th of February, 1901, the capital stock of the new company was increased to $500,000, of which $50,000 was preferred stock. On the 7th day of August, 1901, the directors again increased the capital stock to $1,250,000, of which $500,000 was preferred stock. Since the filing of the bill in this suit, the preferred stock has been increased to $750,000. Up to the time of filing the bill, the sales of preferred stock amounted to $283,100. At the time

of the hearing, the sales amounted to $600,000. With the proceeds of this preferred stock, the mortgages were paid and discharged. After the foreclosure of the Bement mortgage, the new company settled with all of the holders of preferred stock in the old company, except complainant. To some they issued common stock in the new company, and to others preferred stock.

On December 8, 1899, complainant wrote to the new company, as follows:

"*Dear Sirs:* Will you kindly advise me if you are ready to resume payment of interest on the preferred stock policy held by me, or at what time it is expected you will be."

To this letter A. O. Bement replied, on stationery having the business heading of "E. Bement & Sons," as follows:

"LANSING, MICH., Dec. 21st, 1899.
"E. W. SPARROW,
          "City.

"*Dear Sir:* At the present time, it is impossible to tell at what time the dividends will be resumed upon your stock.

"Yours truly,
                                  "A. O. BEMENT."

As to this correspondence, Mr. Bement testified as follows:

"*Q. At that time, did you recognize any legal value to that stock?*

"*A. I don't think we did.*

"*Q. Why did you reply to him in that way?*

"*A. I didn't think it was necessary to get into any controversy at that time.*

"*Q.* Why avoid it at that time in particular?

"*A.* Well, I had about all the controversies on hand I cared for.

"*Q.* Well, then you expected there would be a controversy when you told him squarely that his stock drew no more dividends?

"*A. I imagined from the tone of his communication he was figuring on dividends on his preferred stock which I had no idea he would ever receive.*

"*Q.* Then why didn't you say so to him?

"*A.* Because, as I said before, I didn't think it was necessary."

On the 2d of August, 1901, the following notice was mailed to complainant:

"LANSING, MICH., Aug. 2, 1901.

" E. W. SPARROW,
"City.

" *Dear Sir:* In accordance with article 13 of the by-laws, you are hereby notified that there will be a meeting of the stockholders of E. Bement's Sons, in the office of the company, at 4 p. m., on Wednesday, August 7th, to take into consideration the proposition to increase the capital stock.

"The notice of the meeting on Monday, August 4th, was in error and this is to take its place.

"Yours truly,
[Signed]      "E. BEMENT'S SONS,
"By A. O. BEMENT,
"President."

Eventually the new company refused to recognize any legal interest of complainant in the stock or property of the company, and he filed his bill of complaint against it and the old company in the circuit court for Ingham county, in chancery, praying—

"That E. Bement & Sons and E. Bement's Sons be made defendants to this bill, and required to answer the same.

"That the property and assets so transferred to E. Bement's Sons be decreed a trust fund for the payment to your orator of the par value of his preferred stock as of the time E. Bement & Sons ceased to do business, and of all dividends then accrued and unpaid, with interest.

"That the defendants be decreed to make such payments to your orator.

"Or, if such relief shall not be granted:

"That said defendant E. Bement's Sons be decreed to issue to your orator preferred stock in such corporation—E. Bement's Sons—of the same amounts, kind, and character as that now held by him, your orator hereby offering to surrender his stock in E. Bement & Sons.

"That defendants pay to your orator dividends upon such stock, or upon the stock he now holds, from the date of the last dividend so received by him as aforesaid."

Upon hearing in open court, decree was entered in favor of complainant—

"That the said E. Bement's Sons pay to complainant, within 60 days from the date of this decree, the said sum of $9,620, together with further interest upon the said principal of $6,500 at the rate of 6 per cent. per annum from the said 15th day of March, 1904, to the date of such payment; provided, however, that in lieu of such payment, and in full satisfaction thereof, the said E. Bement's Sons may, at its option, pay to the said complainant, within said 60 days from the date of this decree, the sum of $3,120, the same being accrued dividends and interest as aforesaid, up to March 15, 1904, with interest thereon from said March 15, 1904, to date of payment, at rate of six per cent., and issue and deliver to complainant, within said 60 days, 650 shares of the preferred stock of said E. Bement's Sons, of the par value of $6,500, to be issued in accordance with the statute and the existing by-laws of said E. Bement's Sons, bearing cumulative dividends from the 15th day of March, 1904, at the rate of 6 per cent. payable quarterly, and subject to redemption at par, on or before May 31, 1914."

From this decree defendant E. Bement's Sons appeal to this court.

Counsel for complainant contends that the sale of its property by the old company to the new was void as to him because:

"The interest of the two companies was adverse; one being vendor, the other purchaser. By this agreement the same individuals represented both parties, and in one capacity contracted with themselves in another capacity. As directors of the new company, they were the beneficiaries, and no one representing the old company was left to protect its interests.

"The agreement was void for want of parties. As said in *Miner* v. *Ice Co.*, 93 Mich. 97, 109, 110 (17 L. R. A. 412):

"'All the authorities agree that it is essential that a majority of the quorum of a board of directors shall be disinterested in respect to the matters voted upon.'"

Counsel for defendant concede—

"That the new company, organized as this company

was, could not ordinarily buy the assets of the old company at private sale without making itself liable to account to the creditors and minority stockholders of the old company for the fair value of the assets at the time of the sale. This is the doctrine of the Supreme Court of this State in *Smith* v. *Smith, Sturgeon & Co.*, 125 Mich. 234, and by the United States circuit court in *Ervin* v. *Navigation Co.*, 27 Fed. 625. But in our view those cases have no application to this case, because we depend, not upon a private sale, but upon the fact that the new company was the purchaser at judicial sales of this property, which were lawfully made, and that the new company had the same right to purchase as any one else."

It is conceded that the mortgage foreclosure by the trustee Bement was regular, so far as the formal requirements of the law are concerned, and that, so far as the records are concerned, the new company acquired a valid title under the commissioner's deed. But the title will not protect defendant, if it was fraudulently acquired as to complainant. *Sweet* v. *Converse*, 88 Mich. 1.

"It does not alter the fraudulent character of the arrangement that the end was accomplished through the agency of valid mortgages regularly enforced." *Goddard* v. *Importing Co.*, 9 Colo. App. 306.

*Fishel* v. *Goddard*, 30 Colo. 147. As said in *Ervin* v. *Navigation Co.*, 27 Fed. 625:

"Although the minority of stockholders cannot complain merely because the majority have dissolved the corporation and sold its property, they may justly complain because the majority, while occupying a fiduciary relation towards the minority, have exercised their powers in a way to buy the property for themselves and exclude the minority from a fair participation in the fruits of the sale."

In *Smith* v. *Smith, Sturgeon & Co.*, 125 Mich. 234, it was said, conceding that it was within the power of the board of directors of the corporation to sell all of its assets in payment of its debts:

"If that be conceded, the fact remains that the directors have no right to profit out of such sale. The testimony

shows that while all the other stockholders lost their investments, Sturgeon and Dorr saved theirs; for they obtained without cost the same number of shares in the new corporation admittedly worth par that they had in the old," etc.

In *Miner* v. *Ice Co.*, 93 Mich. 97, 116 (17 L. R. A. 412), it was said:

"The law requires of the majority the utmost good faith in the control and management of the corporation as to the minority. It is of the essence of this trust that it shall be so managed as to produce for each stockholder the best possible return for his investment."

See, also, *Wilson* v. *Æolian Co.*, 64 App. Div. 337; Morawetz on Private Corporations (2d Ed.), §§ 516, 527, 528, 617; *Goodin* v. *Canal Co.*, 18 Ohio St. 169.

The circumstances of this case are somewhat unusual. The new company was formed, confessedly, because the old company was unable to raise a few thousand dollars to settle with a few of the creditors, for the purpose of having the mortgages against itself foreclosed, bidding in the property at the foreclosure sale, and thereby cutting off the recalcitrant creditors and the holders of its preferred stock, and "in making this purchase of the business and assuming the responsibilities and obligations of the old business, there was a profit to the promoters of that business, if they succeeded in carrying the enterprise through successfully." The "promoters" were the directors of the old company. The fact that the wife of one and the sons of others were presented with stock in the new company did not change the situation. The old officers and directors managed the new company precisely as they had the old. The old company had no money with which to pay a small fraction of its indebtedness, but was compelled to call upon its employés to help it out by buying in certain of the claims at 75 cents on the dollar. The new company had nothing except what it got from the old company. It is apparent from the record that the new company never contemplated bidding against others in

competition for the property, but that it intended to so control the situation between the old and the new companies as to get the property without the payment of a dollar for it, and, in the process of acquiring it, to shut out the creditors, who refused to accept the mortgages, and the preferred stockholders of the old company. It was enabled to do this by the president and the financial manager of both companies being the person who held the trust mortgages, and the other officers and a majority of the board of directors being the self-same persons. The creditors were never consulted as to any of the proceedings to foreclose either the chattel or the real estate mortgages, but only the trustee's fellow directors. It was contemplated by the original agreement with the creditors that a reorganization might be advisable, and that it might be necessary to foreclose the Cahill mortgages and bid in the property for the benefit of "E. Bement & Sons, their successors or assigns," and, after the issuance of the stock provided for in the agreement, the balance, whether of "E. Bement & Sons or of its successors, to be hereafter organized, shall be divided among the present stockholders of E. Bement & Sons pro rata, according to their present holdings."

The interests of the preferred stockholders were, apparently, intended to be protected. Afterwards the directors seem to have concluded that it was to the interest of the "promoters" of the new company to shut them out. There was no one to oppose this interest on behalf of the preferred stockholders, since the directors and officers of the old company, whose duty it was to protect the interests of the preferred stockholders, were the very persons who would profit by excluding their interests. Having given complainant to understand that his preferred stock was recognized by the company as still existing, and having notified him that he was still a stockholder and entitled to participate in the meetings of the company, it must be held that, to all practical intents and purposes, in the view of a court of equity, the two companies were

identical so far as the rights of complainant are concerned, and that the attempt to deprive him of his stock, after creating such belief, was a legal fraud upon him. Contracts, under such circumstances, are a solemn farce, and can only be sustained by judicial jugglery. The undisputed testimony shows that the directors of the new company, a majority of whom were the directors of the old company, intended to cut off complainant's rights, and the president of the new company, as well as of the old, substantially admits that as such president he intentionally induced complainant to believe that the new company recognized his preferred stock as an existing interest in that company, in order to prevent him from taking any steps to enforce his rights in the courts until, as holder of the trust mortgage, the president could sell the property to himself and the other directors of the old company.

We do not regard the case of *Armour* v. *E. Bement's Sons*, 123 Fed. 56, as in conflict with this opinion. That was an action at law, and the court held that under the pleadings and proofs the companies must be considered to be distinct, saying, however, that—

" Sometimes peculiar circumstances arise in the succession of corporate organizations in which the powers of a court of equity may be properly invoked to work out the rights of parties. In such cases, if justice requires it, the court will look beyond matters of form, and treat the corporation as an association of individuals, and, on bringing the parties before it, may administer equitable rights, as the nature of the case may require. But a court of law which recognizes a corporation only as a distinct entity and must proceed upon strictly legal methods, has not the means, and is not, therefore, the proper forum in which to investigate and adjudge such matters."

The court expressly declined to consider the question whether there was any fraud in the acquisition of the property of the old company, for the reason assigned that—

" The question whether there was any fraud in the transfer from the one corporation to the other which affected the validity of such transfer, has no relevancy to the

question whether the new corporation is liable to pay the debts of the old, however important it might be in a suit prosecuted for the purpose of subjecting the assets transferred to the payment of the debts of creditors."

The new company, through its president, having practically represented to complainant that it would recognize his stock, and having given him notice of its meetings, which were only consistent with the view that they did recognize such stock, it would be inequitable to permit the company to escape liability on the plea that it intended to defraud him through the forms of law. A court of law may not be able to deal with such a situation from the necessity of adhering to the rigid rules and forms which govern its proceedings, but a court of equity will disregard forms and deal with substances.

We think, therefore, that the court below was right in holding that, on the merits, the complainant was entitled to a decree, and we do not think it was necessary to make the stockholders in the new company parties to the suit. No relief is sought against the stockholders personally, and in such cases it is not usually necessary to join them as parties. 4 Thompson on Corporations, § 4583. Furthermore, if this objection were a good one, it should have been raised, at least, upon the hearing below, where, if held good, an amendment would have been granted. *Holcomb* v. *Mosher*, 50 Mich. 252. But, so far as the record discloses, this objection is raised for the first time in the brief of appellants in this court. Since the decree below, the new company has been dissolved, and its property is now in the hands of a receiver. Under such circumstances, we do not think this contention ought to prevail, even if well founded, if made opportunely.

The assets of the old company which were acquired by the new company were, for use in its business, of considerably greater value than the amount of its liabilities; but it is clear that, if the property had been sold on the mortgages in the usual way to outsiders, it would not have paid the creditors, and complainant's stock would have

been a total loss. All that complainant can justly complain of is that he has been deprived of his stock and the share of the profits which it would have brought to him. It would, manifestly, be inequitable to prefer complainant over the other preferred stockholders who have paid cash for their stock, the same as he did.

A decree may be entered in favor of complainant for the value of 650 shares of preferred stock in the new company, as of the date of the decree in the court below, and for such dividends as the preferred stock may have actually been paid since the formation of said new company.

MOORE, C. J., and CARPENTER, McALVAY, and HOOKER, JJ., concurred.