## PEOPLE v. JOHNSON.

1. EVIDENCE—CRIMINAL LAW—RES GESTÆ—TRIAL—MURDER.

At the trial of a homicide case, the court did not err in receiving testimony as to what was said by the wounded man after he was carried into a house immediately following the shooting, the testimony being competent as part of the res gestæ.

2. SAME—HEARSAY.

But it was reversible error for the court to go further and permit the prosecution to show what he said about having a gun, i. e., that he never had one, where it was not a spontaneous statement of decedent in relation to the res gestæ, but made in answer to questions put by the witness.

3. SAME—CROSS-EXAMINATION—LEADING QUESTIONS.

The trial court is vested with a considerable discretion in permitting leading questions to be asked an unwilling witness.

4. SAME—MURDER—DYING DECLARATION.

It was erroneous to permit a witness, who went to the hospital to see deceased at the sheriff's request, to testify that he asked if deceased had a gun and the latter responded, "No, I didn't have a gun," and that he further stated that he had a knife.

5. CRIMINAL LAW—TRIAL—EVIDENCE.

For the purpose of showing that the victim understood he was in extremis, the prosecution was not warranted in calling to the witness stand decedent's wife and in having her describe the harrowing details of the death-bed scene: especially where the prosecuting attorney made effective use of the proofs in his argument.

Exceptions before sentence from Houghton; O'Brien, J. Submitted April 23, 1915. (Docket No. 123.) Decided June 7, 1915.

James Johnson was convicted of manslaughter. Reversed.

*Anthony Lucas,* Prosecuting Attorney, and *George E. Nichols,* Assistant Prosecuting Attorney, for the people.

*D. L. Robinson* and *Burritt & Burritt,* for respondent.

MOORE, J. On January 31, 1914, John Laitila, a miner, received wounds which resulted in his death on February 13, 1914. The respondent was charged with his murder. He was convicted of manslaughter. The case is here on exceptions before sentence.

The respondent is a Norwegian, who came to this country in 1913. He went to Houghton county in the fall of that year, to work in the mines. A miners' strike was on at the time, but he claims he did not know of it until the third morning after his arrival, when a man called Big Mike told him, and said he must not work, and advised him to join the union, and that if he went to work he would shoot him. He did go to work.

On the evening of the 31st of January, 1914, the respondent, Emil Strang, Oscar Strang, and one Kettunen went to Houghton to get their checks cashed. While there they visited several places, including saloons. About 11 o'clock they started for home. They passed the Cote boarding house. Respondent's version of what then occurred is as follows:

"*Q.* Before you got to the railroad track did anything happen?

"*A.* Just as we got to the boarding house, we were a short distance past the boarding house, I looked back and saw a man that was pretty close to us.

"*Q.* What was the man doing?

"*A.* He was walking.

"*Q.* How close was he to you?

"*A.* I cannot exactly say as to the feet, but he wasn't very far.

"*Q.* Was anything spoken between you or any member of your company and the man?

"*A.* Yes; he walked alongside of me. He had his hand in his overcoat pocket, and he turned towards me and asked if you are a union man. I told him, 'No.' He asked me if we were scabs. I told him, 'Yes,' that we were workingmen; and then I asked him if he was a union man, and he said, 'Yes,' and 'Satana' Red.

"*Q.* Did you ask him to—was anything said about Socialists?

"*A.* It was either Emil or I that asked him whether he was a Socialist.

"*Q.* What did he say then?

"*A.* 'Yes,' he said again, 'Yes,' and 'Satana' Red.

"*Q.* And was anything else said?

"*A.* No; there was no other talk, but immediately as he said that he raised his hand, and he had an open knife in his hand.

"*Q.* Step down from the chair, Johnson. (Witness complies with the request.)

"*Mr. Burritt:* I place in the witness' hand People's Exhibit No. 7.

"*Q.* Take that knife and demonstrate to the jury what Laitila did, or what the man did at that time.

"*A.* Just as he said that, that 'I am a Socialist and a "Satana" Red,' he raised his hand (in the attitude shown by the witness), and I saw the blade shining in the air.

"*Q.* What did you do then?

"*A.* I told Emil to 'look out for yourself; that he has a knfe.'

"*Q.* What did you do next when you saw the knife brandished?

"*A.* Just as I saw him I tried to get away from him, and my foot slipped, and I fell down.

"*Q.* Now what happened next?

"*A.* I turned around this way so that I could get up, and then there was a report, and I was shot in the hip.

"*Q.* Then as you attempted to get up you heard the report, and you was shot in the hip, was you?

"*A.* Yes.

"*Q.* What did you do next?

"*A.* He immediately after that—it didn't take me very long to get up, but I began to retreat; as I was going the first time I shot at him (as indicated by the witness) ; I shot towards Laitila.

"*Q.* And you drew your gun and began to shoot towards Laitila, did you?

"*A.* Yes, sir.

"*Q.* Did you continue to get away from Laitila as you were shooting, or did you stop and stand still?"

"*A.* Yes; I did stand still.

"*Q.* And how long?

"*A.* It wasn't a very long time; just enough so that we stopped and again started.

"*Q.* Did you continue to fire your gun two or three or several times?

"*A.* I shot four times; I examined my gun afterwards, so that I know how many cartridges had been discharged. (Revolver shown witness, and he identified it as his revolver.)

"*Q.* Now state to the court and jury whether you were excited and frightened at the time when you saw the knife.

"*A.* I was frightened.

"*Q.* Why was you frightened?

"*A.* I was afraid of my life.

"*Q.* Why was you afraid of your life?

"*A.* For the reason that I did not want to die as yet, and thought who would take care of my family and those that were dependent on me if I should be mortally wounded.

"*Q.* You was afraid that Laitila would do you an injury?

"*A.* Yes, sir; after I quit firing I began to run. I shot all the four at one time, and began to run; shot them all one right after the other. Laitila fired shots. I didn't see the gun, but I saw the flashes. I think the gun was in Laitila's hands, because no one else was on that side. We began to run towards the railroad track; we went along the railroad track. We ran away from the place for the reason I didn't know whether there were strikers or scabs living in that vicinity, and I was afraid they would come in a gang or group and injure us. I ran a short distance, and

then I glanced backwards and saw Laitila. One shot took effect on my left hip. After I left there I went along the railroad track to the rock burrow. I went below the rock burrow as I saw a light. I was somewhat excited; I didn't know what was coming; I was excited because I was afraid on account of the shooting, because I had never been in such close proximity to shooting."

The bullet which wounded Mr. Laitila was found. It was of a different size from those which would fit the respondent's revolver.

The record and appellant's brief are very long. The assignments of error are discussed by counsel under the following heads:

"(1) The ruling of the court in admitting in evidence over the defendant's objection the statements alleged to have been made by the deceased before and after he was taken into the Cote boarding house.

"(2) The ruling of the court in permitting the prosecuting attorney to cross-examine the people's witness Edward Baker for the purpose of discrediting his testimony.

"(3) The ruling of the court in admitting in evidence over the defendant's objection the statements made by the deceased while in the hospital, as dying declarations.

"(4) The error of the court in admitting in evidence over the defendant's objection the guns covered by the experiments of the witness Nichols and the witness Woodward.

"(5) The error of the court in refusing to instruct the jury as requested by the defendant.

"(6) Errors committed by the court in his instructions to the jury.

"(7) Error committed by the court in instructing the stenographer to read the charge to the jury when they returned into court for further instructions."

We will take them up, so far as we discuss them, in the order presented by counsel:

1. It has already appeared that the shooting oc-

curred near the Cote boarding house. Persons in and about the house heard the shooting, and some of them saw the flashes from the guns. They at once rushed to the scene, found Mr. Laitila, and took him into the house. They were permitted to state what they saw and heard of the occurrence. Over the objection of counsel that it was hearsay, they were allowed to testify what Mr. Laitila said about the shooting. The witnesses say this conversation occurred within a few minutes of the shooting. It was admitted upon the theory that it was part of the *res gestæ*. The doctrine of *res gestæ* is discussed at considerable length in *People* v. *Simpson*, 48 Mich. 474 (12 N. W. 662); *White* v. *City of Marquette*, 140 Mich. 310 (103 N. W. 698); *Gilbert* v. *Railroad Co.*, 161 Mich. 73 (125 N. W. 745), and the cases cited therein. We think these cases are authority for the admission of Mr. Laitila's statements as to the shooting.

The court, however, allowed the witnesses to go further. The record shows:

"*Q.* What, if anything, did he say about a gun?
"*Mr. Burritt:* That is under the same objection, your honor.
"*The Court:* Yes; that may be considered under the same objection.
"*A.* He said he never had a gun."

This was not a spontaneous statement of the deceased in relation to the *res gestæ*, and should not have been permitted.

2. A trial court is allowed a good deal of discretion in controlling the examination of an unwilling witness by putting to him leading questions. *People* v. *Case*, 105 Mich. 92 (62 N. W. 1017). We cannot say from the record that the court erred in this respect.

3. Did the court err in admitting evidence of the dying declarations of the deceased? This court has

had occasion to discuss the doctrine of dying declarations repeatedly. We call attention to two cases and the authorities cited therein. They are *People* v. *Beverly*, 108 Mich. 509 (66 N. W. 379), and *People* v. *Lonsdale*, 122 Mich. 388 (81 N. W. 277). Under these authorities a proper foundation was laid for the admission of the testimony of Mr. Sommero, which gave Mr. Laitila's version of the shooting.

The following appears in the record:

"John P. Laity recalled.

"Q. Did you go to see John Laitila at the hospital?

"A. Yes, sir; I was sent there by the sheriff to see John Laitila; have a talk with him. I had a talk with him; I talked with him in Finnish; I did not tell him my purpose in going there. Edward Sommero and Adolph Aho were there. I asked him did he have a gun, and he—

"*Mr. Burritt:* This is objected to, if the court please, as incompetent, hearsay, self-serving statements of the deceased, not made under the sense of impending death.

"*The Court:* The objection is overruled.

"Q. Go on.

"A. And he answered, 'No; I didn't have a gun;' and I asked him, 'Did you have a knife?' and he answered, 'I had a knife; no gun; I never attack any one without cause.'"

We think the admission of this testimony was error. The prosecution called Mrs. Laitila for the purpose, as stated by counsel in the brief, "of showing that within a very few hours after the declarations of Laitila made to Sommero that he was going to die that he understood that fact that he was *in extremis* at the very time that he had the conversation with Sommero." The witness was allowed to describe in detail a most pathetic deathbed scene culminating in the death of her husband. We know of no rules of evidence that made this permissible, and with the effective use made of it by counsel in his argument it is quite clear it was harmful error.

The other errors assigned have been considered, but we think it unnecessary to discuss them.

For the reasons stated, the case is reversed, and a new trial ordered.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OSTRANDER, BIRD, and STEERE, JJ., concurred.