LELAND v. FORD.

1. Corporations—Contracts—Public Policy—Agreement by Director to Keep Officer Permanently Void.

An agreement by a director of a corporation to keep another person permanently in place as an officer of the corporation is void as against public policy, even though there was not to be any direct private gain to the promisor.

2. Same—Duty of Officers Seeking Reorganization to Protect all Stockholders.

Where officers of a corporation in the hands of a receiver publicly announced that they proposed to secure a reorganization which would protect the creditors and stockholders from loss, in reliance upon which many of the stockholders took no steps to protect themselves, it was the duty of said officers, if they acted at all, to look out for the interests of all of the stockholders, and not for a portion only.

3. Same—Contract for Reorganization Protecting Only Part of Stockholders Void.

A contract for the reorganization of a corporation which contemplates the taking care of a portion only of the stockholders, and

As to right of minority stockholders to representation in new or reorganized corporation, see annotation in 10 L. R. A. (N. S.) 725.

On meaning of maxim as to clean hands, see annotation in 4 A. L. R. 44.

the exclusion of another portion from the benefits thereof, is fraudulent and cannot stand.

4. EQUITY.—"CLEAN HANDS" MAXIM NOT APPLICABLE TO DEFENDANTS.

The maxim "he who comes into equity must come with clean hands" does not apply to defendants; they not having come into a court of equity seeking any relief, but having been brought there by plaintiffs.

5. SAME—CONTRACTS—NO ACTION ARISES FROM ILLEGAL CONTRACT.

The proposition is universal that no action arises, in equity or at law, from an illegal contract; no suit may be maintained for its specific performance, or to recover the property agreed to be sold or delivered, or the money agreed to be paid, or damages for its violation.

6. SAME—COURTS REFUSE RELIEF WHERE CONTRACT FRAUDULENT EVEN IF FRAUD AIMED AT THIRD PARTY.

Courts should not be eager to find that contracts fall within the prohibited class, or to find that the parties are *in pari delicto*, but, when once satisfied that the contract is permeated with illegality and conceived in fraud, even though the fraud is aimed at a third person, they should refuse relief to either and leave the parties where, by their fraudulent conduct, they have left themselves.

7. CORPORATIONS—STOCKHOLDERS NOT CREDITORS AS ORDINARILY UNDERSTOOD.

Stockholders are not creditors of the corporation as that word is generally understood.

8. FRAUDS, STATUTE OF—ORAL CONTRACT TO PAY STOCKHOLDERS AS PART OF PURCHASE PRICE OF CORPORATION'S ASSETS.

If the purchasers of the assets of a corporation in the hands of a receiver orally contracted, as part of the purchase price, to pay the stockholders the amount they had invested in the company, which is a primary obligation, the statute of frauds does not prevent its enforcement, on the ground that the promise, if made, was one to answer for the debt, default, or misdoings of another.

9. AUCTIONS—COMPETITIVE SALES—WHEN AGREEMENT TO SUPPRESS COMPETITIVE BIDDING WILL BE UPHELD BY COURTS.

Although agreements which stifle competitive bidding, or chill the sale, as it is sometimes called, are, generally, contrary to

public policy, this is not always so, but the courts will look to the intention of the parties, and if that is fair and honest, and the primary purpose is not to suppress competition, but to protect their own rights or advance their own interests, and there is no fraudulent purpose to injure or defraud others interested in the result of the sale, the agreement may be upheld.

10. EQUITY—PLEADING—SUFFICIENCY—BILL DISMISSED WITH LEAVE TO APPLY FOR PERMISSION TO FILE AMENDED BILL.

Where a contract for the reorganization of a corporation in the hands of a receiver protected the rights of majority stockholders, but would be void as against public policy for failure to protect the rights of minority stockholders, if any exist, and it does not appear from the pleadings whether any such minority stockholders do exist, the bill for enforcement of the contract is dismissed, on appeal, and the case remanded with leave to plaintiffs to apply for permission to file an amended bill.

WIEST, CLARK, and SHARPE, JJ., dissenting.

Appeal from Oakland; Covert (Frank L.), J. Submitted June 7, 1928. (Docket No. 33, Calendar No. 33,774.) Decided February 1, 1929. Rehearing denied March 29, 1929.

Bill by Wilfred C. Leland and others against Henry Ford and others for an accounting. From an order denying a motion to dismiss, defendants appeal. Reversed and remanded, with leave to apply for permission to file amended bill.

*Kenneth M. Stevens* and *William Henry Gallagher,* for plaintiffs.

*Clifford B. Longley* and *Wallace R. Middleton* (*Louis J. Colombo,* of counsel), for defendants.

From the opinion of the trial judge, the following résumé of the facts alleged in the bill is taken:

"The matter turns largely upon the construction to be placed upon the contract, which is the basis of

the action, as set up in the bill of complaint. It is alleged that the Lelands were the promoters of a certain corporation known as the Lincoln Motor Company, organized in 1920 for the manufacture of high-grade automobiles. Class B stock was issued of no par value and paid for in property to the extent of $1,500,000, and class A, preferred stock of the par value of $50, most of which was sold approximately at par. The corporation acquired a modern plant, fully equipped, with a highly skilled body of workmen and a very efficient selling organization. The Lelands had been for many years engaged in the manufacture of such cars and had acquired a high reputation for integrity, business ability, and technical skill in designing and manufacturing cars of this type.

"It is alleged that because of the aforesaid reputation of the Lelands, many people had invested in class A stock of the corporation and other persons had extended credit to the corporation to a very considerable extent.

"Later on, because of some financial depression a majority of the stockholders deemed it advisable to effect the reorganization of the business, and to that end caused a receiver to be appointed by the Federal court for the eastern district of Michigan. The Lelands and some of the other stockholders were opposed to such reorganization, deeming it unnecessary, and announced that they proposed to procure additional capital and reorganize the company so that the stockholders and creditors of the corporation would be protected against loss. That in order to carry out such a plan, a committee was appointed by the stockholders to protect their interests.

"It is the further claim of the plaintiffs, that the value of the assets of the corporation consisted to a very large extent of the organization of the selling force, the manufacturing personnel, the ability and skill of the Lelands and the fact that it was a going concern. That without these intangible assets, the property would be worth comparatively little.

"The Lelands, in an endeavor to protect the interests of various stockholders and creditors, approached the defendants with a view of interesting them in the purchase of the property, so that an amount might be realized from the sale thereof sufficient to pay the creditors and stockholders for their investment and thereby prevent loss to any of the interested parties. They represented to the defendants that the value of the assets of the corporation· would be greatly enhanced if they, the Lelands, would assist in the reorganization and continue as directors and officers of the new corporation to be organized to take over the assets of the one then in the hands of the receiver, and in pursuance of such representations, agreed to join a new corporation as executives and with their skill and business efficiency and the retention of their selling force and manufacturing personnel, aid in every way to make the new corporation a success, and that they further would aid in procuring an early sale by the receiver and thus avoid any material lapse in the business, so that the defendants would take it over practically as a going concern.

"The value of this transaction to the defendants would be the acquiring of a very valuable plant, the benefit of the skill and ability of the Lelands as designers and manufacturers of high grade automobiles, their manufacturing and sales force, fully organized, all of which would make the property very much more valuable than though it were a defunct organization.

"They proposed to the defendants that in consideration of acquiring this valuable property, the defendants should purchase the property at the receiver's sale, paying such price for the tangible assets as was reasonable and fair, and that in addition thereto they were to pay all the creditors and refund to class B stockholders the amount invested by them, i. e., $1,500,000, and further to pay to class A stockholders (except such stock as might be in the hands of brokers and held by other persons who had bought

the same at $3 or less per share), the full amount of their investment in such stock. That if such proposition was accepted, the Lelands would make no further effort to interest other capital and would urge the speedy sale of the assets of the corporation.

"The defendants, after a careful investigation of the proposition, and going over the books of the corporation, accepted the offer, and thereupon the parties waited upon the Federal judge and informed him of the proposed sale and made no further efforts to interest additional capital. That subsequently the sale was held, the defendants buying the property for $8,000,000. The new corporation was then formed, in pursuance of the agreement, the Lelands participating in the new organization, becoming directors and officers of the same and conducting business as theretofore. The defendants, in addition to paying the purchase price, also reimbursed the creditors and some of the stockholders."

The bill is filed by the Lelands, with whom are joined probably 2,000 other stockholders of the Lincoln Motor Company, for whom it is alleged the Lelands acted and for whom they were agents and trustees. The defendants filed a motion to dismiss the bill. Briefly stated and without elaboration of detail, the grounds of the motion were that the agreement as set up in the bill was invalid and unenforceable, (1) because against public policy in that it was made for the advantage and benefit of the Lelands especially, and of a part only of the stockholders, and excluded other stockholders from its benefits; (2) that it was within the statute of frauds in that defendants' promise, if made, was one to answer for the debt, default, or misdoings of another (3 Comp. Laws 1915, § 11981); and (3) that it was a contract to stifle bidding at a judicial sale. The trial judge overruled the motion to dismiss, and

the case is before us on this appeal from his order in so doing.

FELLOWS, J. (*after stating the facts*). 1. To my mind the serious question presented on this record is involved in the first ground urged. The bill alleges in substance that the Fords agreed that the Lelands should be the managers of the new corporation and should be elected to its board of directors. It also alleges that the agreement, which was an oral one, contemplated a settlement with the Lelands and stockholders other than brokers, others who had bought stock at $3 per share or less, and other than those who purchased stock after the appointment of the receiver. It was not alleged in the bill that there were stockholders of these classes, and for this reason the trial judge declined to consider this question. I think the question of the validity of the contract which is sought to be enforced is before us and should be decided. The contract upon its face excluded certain classes of stockholders who for want of a better name we will style minority stockholders; if there were no such stockholders, there was no necessity for considering them in the agreement, and if there were none of such classes, plaintiffs should have so stated in their bill. If the agreement by the Fords to vote for the Lelands for directors and managers of the corporation was invalid and the agreement contemplating the exclusion of minority stockholders was a fraud upon them and rendered the contract invalid, and defendants may be heard in a court of equity to assert such invalidity, it should be so held upon this appeal. I shall consider the points separately.

(a) The bill alleges that the Lelands were president and vice-president respectively of the old cor-

poration, and that they were to have the management and control of the new company and were to have important and probably lucrative positions in it. It alleges that after it was organized they were given such positions but were later relieved of them. Of this they complain, and it is patent that they construe the contract to require their continued employment, and their continued election to their respective offices.

In *West* v. *Camden,* 135 U. S. 507 (10 Sup. Ct. 838), it was held (quoting from the syllabus):

"An agreement by a director of a corporation to keep another person permanently in place as an officer of the corporation is void as against public policy, even though there was not to be any direct private gain to the promisor."

This case was followed and exhaustively quoted from in *Scripps* v. *Sweeney,* 160 Mich. 148. In *Wilbur* v. *Stoepel,* 82 Mich. 344 (21 Am. St. Rep. 568), the same rule was recognized, and it was held that the contract was not a severable one and the invalid provision permeated the whole of it and rendered it unenforceable. There is no allegation in the bill that it was agreed that the reorganized corporation was to be a close corporation. It had to have more than two stockholders. Act No. 84, Pub. Acts 1921, § 1 (Comp. Laws Supp. 1922, § 9053 [1]). It is alleged that as organized the defendants Ford own all its stock, but that one share is in the name of defendant Craig for organization purposes. Whether the rule announced in the cases above cited should obtain in the case if it was agreed that the new corporation was to be a close corporation is not before us. Possibly leave should be granted to apply to the court below for permission to amend in this particular.

(*b*) The bill shows that directors of the old company other than the Lelands had decided that a reorganization of the company was necessary, and that the Lelands opposed such plan and that the appointment of a receiver was obtained by such other interests. The bill alleges that after the receiver was appointed the Lelands publicly announced that such action was against their protest and that they proposed to secure a reorganization which would protect the creditors and stockholders from loss, and that many of the stockholders, relying on such announcement, took no steps to protect themselves. After making this public announcement with the reliance on it by the stockholders, the Lelands proceeded to make a contract with defendants Ford, which, if carried out, insured them continued employment and important positions, insured them and a part of the stockholders a return of their money invested in the company, and left the minority stockholders out in the cold. We need not disagree with plaintiffs' counsel in their contention that, when the receiver was appointed, the officers, including plaintiffs, ceased to function.. We may, for the purposes of the case, hold that upon the appointment of a receiver they owed no legal duty to help the stockholders or any one else in reorganizing the company. What we do hold, and it is all that the purposes of the case require, is that after they publicly announced that they were going to look after the interest of the stockholders, if they acted at all, their duty required them to act for all, not for a portion of the stockholders. A contract for the reorganization of a corporation which contemplates the taking care of a portion only of the stockholders, and the exclusion of another portion from the benefits of the reorganization, is fraudulent and cannot stand. This ques-

tion has been before this court and is settled by *Sparrow* v. *E. Bement & Sons,* 142 Mich. 441 (10 L. R. A. [N. S.] 725). In *Bank of China* v. *Morse,* 168 N. Y. 458, 478 (61 N. E. 774, 56 L. R. A. 139, 85 Am. St. Rep. 676), it was said:

"The equal and ratable distribution of the assets and the equal and ratable enforcement of the liabilities of a company, according to the interest of shareholders therein, is equitable and should be enforced, so that each shareholder may receive an equal proportion of the assets and contribute only an equal proportion to discharge its liabilities. This principle, we think, applies as well to the proceeds of calls as to property already in hand. In other words, shareholders have equal rights and must bear equal burdens."

The man who bought a share of stock for $3 acquired the same interest in the company as the man who paid $50 for his share of stock. It is possible that this question could be eliminated by an amendment alleging, if true, that there were no stockholders of the classes mentioned.

(*c*) May the defendants in this action urge that the contract sought to be enforced and to which they were parties is invalid because contrary to public policy and because fraudulent? The case is in equity, but the maxim "he who comes into equity must come with clean hands" does not apply to defendants; they have not come into a court of equity seeking any relief, they were brought there by plaintiffs. *Klosowski* v. *Klosowski,* 266 Ill. 360 (107 N. E. 634); *Hayes* v. *Schall,* 229 Mo. 114 (129 S. W. 222); *McIver* v. *Clarke,* 69 Miss. 408 (10 South. 581). On the other hand, plaintiffs seek in a court of

equity the enforcement of a contract made with the defendants which in one particular is contrary to public policy, and in another in fraud of third parties. Plaintiffs and defendants are *in pari delicto.* The general rule is thus stated in 2 Pomeroy's Equity Jurisprudence (4th Ed.), § 940:

"The proposition is universal that no action arises, in equity or at law, from an illegal contract; no suit can be maintained for its specific performance, or to recover the property agreed to be sold or delivered, or the money agreed to be paid, or damages for its violation."

And in section 401 of the same work, it is said:

"If a contract has been entered into through fraud, or to accomplish any fraudulent purpose, a court of equity will not, at the suit of one of the fraudulent parties,—a *particeps doli,*—while the agreement is still executory, either compel its execution or decree its cancellation, nor after it has been executed, set it aside, and thus restore the plaintiff to the property or other interests which he had fraudulently transferred. Equity will leave such parties in exactly the positions in which they have placed themselves, refusing all affirmative aid to either of the fraudulent participants. The only equitable remedies which they can obtain are purely defensive."

And further in section 402, it is said:

"Wherever a contract or other transaction is illegal, and the parties thereto are, in contemplation of law, *in pari delicto,* it is a well-settled rule, subject only to a few special exceptions depending upon other consideration of policy, that a court of equity will not aid a *particeps criminis,* either by enforcing the contract ,of obligation while it is yet executory, nor by relieving him against it, by setting it aside,

or by enabling him to recover the title to property which he has parted with by its means.''

Quite likely at first blush we react against such a rule. A deeds to B his farm to defraud his creditors with an agreement that B shall reconvey when requested. We do not admire the sportsmanship of B when he refuses to reconvey, and it may be that we are reluctant to refuse specific performance to A. But if the rule were otherwise, it would be an open invitation to all kinds of fraudulent contracts. Courts should not be eager to find that contracts fall within the prohibited class, or to find that the parties are *in pari delicto,* but when once satisfied that the contract is permeated with illegality and conceived in fraud, and even though the fraud is aimed at a third person, courts should refuse relief to either and leave the parties where, by their fraudulent conduct, they have left themselves. The reason and purpose of the rule is quite well stated in an early Wisconsin case. In *Clemens* v. *Clemens,* 28 Wis. 637, 654 (9 Am. Rep. 520), it was said:

''The principle or policy of the law, therefore, is to reject the suit of and reprove the plaintiff for his wrong, not to reward the defendant. The plaintiff must be punished, even though it be at the expense of allowing the defendant, an equally guilty party, to obtain most unjust and unfair advantage for himself. This looks like punishing one party and rewarding the other for the same immoral or illegal act or contract. But fraud and immorality must be rebuked and discouraged, and this object can not be accomplished in any other way. The suit of the party compelled to seek the aid of the courts, in order to obtain the fruits of his fraud or wrong, must be dismissed, although it may result in unjustly giving to the other equally culpable party the entire benefit of them.''

In speaking of the rule, Justice Shauck said in *Kinner* v. *Railway Co.,* 69 Ohio St. 339, 344 (69 N. E. 614):

"It denies all relief to a suitor, however well founded his claim to equitable relief may otherwise be if, in granting the relief which he seeks, the court would be required, by implication even, to affirm the validity of an unlawful agreement or give its approval to inequitable conduct on his part."

In *Barnes* v. *Starr,* 64 Conn. 136, 155 (28 Atl. 980), it was said:

"A very numerous class of cases coming within the same equitable doctrine is, where the contract or other act is substantially a fraud upon the rights, interests, or intentions of third parties. In a case of this kind, relief is refused to a plaintiff on the ground that he does not come into court with clean hands. The general rule is that the parties to a contract must act not only *bona fide* between themselves, but they shall not act *mala fide* in respect to other persons who stand in such a relation to either as to be affected by the contract or its consequences."

The same thought was conveyed by Mr. Justice GRANT in *Dakin* v. *Rumsey,* 104 Mich. 636, where he said:

"He, therefore, was willing and believed that he was participating in a fraud upon Rumsey. Since he has participated in a supposed fraud upon another for his own gain, equity will not lend its aid to assist him, even if he were the defrauded party."

In *Reynolds* v. *Boland,* 202 Pa. 642, 647 (52 Atl. 19), it was said:

"Equity springs from conscience and is administered through it. He who would reach the con-

science of a chancellor must come with his own void of offense for 'He that hath committed iniquity shall not have equity.' 1 Pomeroy's Equity Jur. 434–443; Bisham's Equity, 60, 61. Specific performance is here prayed for; but it is of grace and not of right. *Pennock* v. *Freeman,* 1 Watts, 409; *Henderson* v. *Hays,* 2 Watts, 148; *Orne* v. *Kittanning Coal Co.,* 114 Pa. 172 (6 Atl. 358); *Datz* v. *Phillips,* 26 W. N. C. 512; *Brown* v. *Pitcairn,* 148 Pa. 387 (24 Atl. 52). From the lips of this complainant, who sues for grace, along with his prayer for a decree that the defendant specifically perform his agreement there comes a confession that its purpose was to deceive, and the ear of the chancellor will not hear the prayer. Into hands soiled by a contract, equity will not place her decree for its enforcement. 'The doors are shut against one, who, in his prior conduct in the very subject-matter at issue, has violated good conscience, good faith or fair dealing.' *Orne* v. *Kittanning Coal Co., supra.* * * *

"It is not pretended that, in the agreement of June 3, 1899, Reynolds and Boland tried to take advantage of each other, or that either was attempting any fraud upon the other. Its sole purpose was the deception of Stetler, to enable Reynolds to accomplish through it what was apparently impossible without it. But this does not relieve it from its baseness, and in it there is no equity for the plaintiff. * * * Stetler is to be wronged. The compact of June 3, 1899, was for that purpose. It still is executory, and equity frowns at the mere suggestion of its enforcement. Both parties to it are parties to its iniquity, and neither has any equity against the other. 'Who comes into equity must come with clean hands. *In pari delicto melior est conditio defendentis.* These are the principles which stand in the plaintiff's way. * * * Who does iniquity shall not have equity; equity has no relief for a party who, in the practice of one fraud, has become the victim of another.' *Hershey* v. *Weiting,* 50 Pa. 240."

In the early day the equity side of the exchequer, in the case of *Everet* v. *Williams,* dealt most severely with those *in pari delicto*—who sought its aid. The bill set up a partnership between the parties and that the parties:

" 'dealt with several gentlemen for divers watches, rings, swords, canes, hats, cloaks, horses, bridles, saddles, and other things to the value of £200 and upwards;' and how there was a gentleman at Blackheath who had several things of this sort to dispose of, which defendant represented 'might be had for little or no money, in case they could prevail on the said gentlemen to part with the said things;' and how, 'after some small discourse with the said gentleman,' the said things were dealt for 'at a very cheap rate.' The bill further recites that the parties' joint dealings were carried on at Bagshot, Salisbury, Hampstead, and elsewhere, to the amount of £2,000 and upwards; and that the defendant would not come to a fair account with the plaintiff touching and concerning the said partnership."

A reference was had to the master, where it developed that the parties were highwaymen, and the partnership property referred to in the bill was their loot. The bill was dismissed, the counsel who signed it, Jonathan Collins, was required to pay the costs, the solicitors for the plaintiff, William White and William Wreathock, were each fined 50 pounds. Later the parties to the suit were hanged. For résumé of this interesting case, see 2 Pothier on Obligations, 2, note; Lindley on Partnership (9th Ed.), p. 124; 9 Law Quarterly Review, 197; *Burrows* v. *Rhodes,* 1 Q. B. Div. (1899) 816.

As we shall remand the case with permission to apply to the circuit court for leave to amend in the particulars noted, we should dispose of the other questions.

2. We are not concerned with the alleged promise of the Fords to pay the creditors of the corporation; they have all been paid. Stockholders are not creditors of the corporation as that word is generally understood. In 7 R. C. L. p. 201, it is said:

"There is one sense in which stockholders, common as well as preferred, are creditors. It is in the sense that a corporation includes all its capital stock among its liabilities, but it is a liability which is postponed to every other liability. As such a creditor, a stockholder is subordinate to every other creditor of the corporation. In the ordinary sense, however, a stockholder cannot be a creditor of the corporation by virtue of his ownership of stock."

The case relied upon by defendants' counsel, *Gansey* v. *Orr,* 173 Mo. 532 (73 S. W. 477), involved the construction of the word "miscarriage" in the statute of frauds of that State, and it was held to include mismanagement of corporate affairs. The case has been criticized by other courts. The allegations of the bill before us assert in effect that the Fords promised as part of the purchase price to pay the stockholders the amount they had invested in the company; this was a primary obligation. If it was entered into the statute of frauds does not prevent its enforcement.

3. Agreements which stifle competitive bidding, or chill the sale, as it is sometimes called, are, generally, contrary to public policy. This is not always so. Cases frequently arise in receivers' sales where no sale could be made except by a combination of interests. Receivers' sales of railroads and of large corporations are of this class. There are but few men in the country with enough money to buy the property offered. There must be a combination of capital, or many interests, in order to effectuate a sale of large

properties. Take a railroad receivership: there are usually several mortgages differing in seniority; there are usually several issues of equipment obligations, common stock, preferred stock, possibly different classes of debentures, unsecured claims, etc. These different interests are usually represented by committees who finally get together and work out a reorganization plan, and it is agreed in advance that the property be sold to a purchasing committee at an agreed figure. Such an agreement is not against public policy and void. Unless such agreements may be made few railroads could ever be sold at receivers' sales. What has been said about railroads is equally applicable to large corporations. The instant case is illustrative. The property as a going concern was worth many millions, but there were few men in the country with enough money to buy or with disposition to buy even if they had the money. Quite likely but little would have been realized even by creditors if an arrangement had not been made with the Fords or others of means in advance of a public sale. The courts have to deal with practical problems, and have, therefore, recognized that agreements made in good faith, which do not operate to chill the sale, but on the contrary produce the best results obtainable, are not contrary to public policy and are not void. In 2 R. C. L. p. 1133, the rule is thus stated:

"While the rights of the vendor and others interested in the property are to be protected, nevertheless prospective purchasers have the right to consult and promote their own interests so long as they do not resort to any fraudulent artifice for that purpose. It is true that in every association formed to bid at a sale whereby one is designated to bid in behalf of the rest, there is an agreement, express or

implied, that no other member will participate in the bidding; and hence in one sense it may be said to have the effect of preventing competition. But it by no means necessarily follows that if the association had not been formed, and each member left to bid on his own account, the competition at the sale would be as strong and efficient as it would by reason of the joint bid for the benefit and upon the responsibility of all. The doctrine which would prohibit associations of individuals to bid, as preventing competition, however specious in theory, is too narrow and limited for the practical business of life, and would oftentimes lead inevitably to the evil consequences it was intended to avoid. Sales in many instances could be effected only after a sacrifice of the value to bring the price within the reach of the means of the individual bidders. Consequently not every combination or association of bidders will invalidate the sale. The courts will look to the intention of the parties, and if that is fair and honest and the primary purpose is not to suppress competition, but to protect their own rights or advance their own interests, and there is no fraudulent purpose to injure or defraud others interested in the result of the sale, the agreement may be upheld. This is especially true in the case of a union of several persons formed on account of the magnitude of the sale, or where the quantity offered to a single bidder exceeds the amount which individuals might wish to purchase on their own account. The intention with which the parties enter into such an agreement is a question of fact for the determination of the jury.''

And in 6 C. J. p. 831, it is said:

''Sales which are effected by combinations of interests or agreements not to bid are voidable or not, according to the object for which parties enter into the agreements. If the purpose is to chill the sale and purchase property for less than its market value, the seller may avoid the sale. If on the other

hand, the agreement is made without any design to commit a fraud, but to enable the parties to the agreement to purchase conveniently, or if the agreement is for any honest purpose, the sale will be valid."

From the face of the bill, and that is all we have before us, it is patent that the agreement was not entered into to chill the sale, and to allow a purchase of the property below its actual value. It is quite evident that the sale brought more money and better results for the creditors and interested parties than would have resulted had the receivership run its course.

The bill before us will be dismissed, and the case remanded with leave to plaintiffs to apply for permission to file an amended bill as indicated in this opinion. Defendants will have costs of this court.

NORTH, C. J., and FEAD, McDONALD, and POTTER, JJ., concurred with FELLOWS, J.

SHARPE, J. 1. The provisions in the alleged contract, as set forth in the bill of complaint, do not, in my opinion, sustain the claim that the promise of the Lelands to continue in the service of the corporation to be organized by the defendants was for their "advantage and benefit." Such promise on their part but secured to the defendants the benefit of the skill and ability of the Lelands and the use of their name as designers and manufacturers of high grade automobiles. This offer on their part, and it was no more than an offer, to remain with the new corporation for the purpose stated, was made as an inducement to the defendants to make the purchase of the assets of the old corporation. It was not made, as I read the contract, as set out in the bill of complaint, to secure any personal advantage to the Lelands. It

is not averred therein that the defendants in any way bound themselves to retain their services for any stated length of time, nor do the Lelands ask for any relief for a breach thereof. The amended bill alleges that the Lelands—

"further explained that they, said Lelands, were primarily interested in the protection of the creditors and stockholders of said corporation, and proposed to exert every effort to effect a reorganization upon a basis that would insure the accomplishment of that purpose."

The agreement further provided that—

"a new company would be formed to take over the assets of said corporation, which company would continue the business of said corporation and would continue its selling organization and would be under the direction and control of said Lelands; that said Lelands would accept the control and direction of said new company and would operate same so as to maintain the high manufacturing standards and ideals of the former company and the high quality of its products."

The understanding of the parties is apparent. The Lelands, as a consideration for the obligations assumed by the defendants, promised to aid them in the conduct of the reorganized corporation to the extent possible on their part.

The bill further alleges that the new corporation began operating under the direction and control of the Lelands and that thereby "the high standing of the products" was given recognition and the "good will of said business was fully maintained," and that after its success had been "definitely assured" the defendants took control thereof and have since continued to direct the same. I find no allegation there-

in of an "agreement by the Fords to vote for the Lelands for directors and managers of the corporation" to be organized by the defendants. The services which the Lelands agreed to render, and did render, were understood to be and were for the benefit and advantage of the defendants. In my opinion the record does not sustain the conclusion reached that the contract was unenforceable for this reason.

2. Is it unenforceable because the interests of what are termed the "minority stockholders" were not protected therein? No question of public policy is here involved. The rights said to be affected are those of the holders of certain certificates of stock in the old company. If it be conceded that the agreement operated as a fraud upon them, may the defendants rely thereon as a defense to this suit? They make no claim of injury by reason thereof. Their rights were in no way affected thereby. They have received all the benefits and advantages secured to them in the agreement, and, if relieved from the obligation therein assumed by them, they will profit to the extent of several millions of dollars.

In an early case in this court (*Quirk* v. *Thomas*, 6 Mich. 76, 107), Mr. Justice CHRISTIANCY said:

"And if a court of equity cannot grant relief in such a case, it must be deplorably infirm in the administration of remedial justice. Just reasoning should lead to just results; and any course of reasoning which leads to a result opposed to the just rights of the parties, should, at least, be carefully scrutinized before it is admitted as established law."

Where the element of fraud enters into a contract, it is not void; it is only voidable. *Hall Lumber Co.* v. *Gustin*, 54 Mich. 624, 632. That which is here claimed to render it so is of no concern to the de-

fendants. They surely would not contend that they understood the contract was unenforceable for this reason at the time they entered into it and that they permitted the Lelands to be deceived thereby. In *Mott* v. *Rowland*, 85 Mich. 561, 566, it was said:

"It cannot be presumed that the parties intended to enter into an illegal contract. The presumption is rather in favor of its validity. The law will presume an honest intention, unless there is something in the nature of the transaction or in the proofs to establish the contrary."

Full performance on the part of the Lelands is alleged. Payment as agreed by the defendants is all that remains to be done. In *Richardson* v. *Welch*, 47 Mich. 309, 312, the court said:

"Even in cases where public and not merely private interests were involved, courts have refused to relieve parties who had the money of other people in their hands, against accounting, when there was no question of public policy to be involved in that transaction;" citing *Willson* v. *Owen*, 30 Mich. 474.

As presented here, there is no claim on the part of the defendants that any deception was practiced upon them. They entered into the contract with full knowledge of its terms and of the purpose sought to be accomplished by the Lelands thereby. That of which they complain has in no way operated prejudicially on their rights under the contract. Its only effect, if their claim be sustained, is to relieve them from the obligation they assumed thereunder. They assert that by reason thereof they may resist payment as agreed.

"The fraud which should give one rights must be a fraud which in some way concerns his own interest." *Judge* v. *Vogel*, 38 Mich. 569, 573.

Quoting further from *Richardson* v. *Welch, supra,* (page 312):

"The rule is general that when contracts are legal except as against persons in adverse interest, courts will not listen to complaints of persons not injured. Conveyances fraudulent as against creditors can only be attacked by creditors, and the principle is general as applied to private frauds. It is no doubt competent for courts of equity to use some discretion when asked to become instruments in helping parties to the fruits of fraud."

In *City of Marquette* v. *Wilkinson,* 119 Mich. 413 (43 L. R. A. 840), the defendant had executed to the city a bond for the safe keeping of its funds. The officials of two other banks became sureties on this bond under an agreement with Wilkinson that their banks would bid less for the deposits and that Wilkinson should keep one-third of the deposits in each bank. On Wilkinson's death the city sought to reach· the money deposited in the other banks. As to the agreement among the banks it was said:

"It is urged that this agreement is void as against public policy. If this be granted, neither Wilkinson, nor the banks, nor the bondsmen could take advantage of it. The city alone could rescind it on this account. It has not chosen to do so, and no other party can complain."

Except that the question of public policy was there involved, this holding was but in accord with the general rule that—

"contracts which are valid, except as against those in adverse interest, cannot be assailed by persons not prejudiced thereby." *Baldwin* v. *Burt,* 43 Neb. 245, 254 (61 N. W. 601).

There is, I think, a clear distinction between a contract prohibited by statute, or which is void be-

cause against public policy, and a private contract such as is here considered. The rule of nonenforcement of the former at the suit of a party thereto is well established. But, as to the latter, one who has received the benefits secured to him thereunder is estopped from asserting its invalidity as a defense. He may not retain that which he has received and resist the performance of obligations fixed therein because such performance will, in effect, operate as a fraud upon others not parties thereto. The rule forbidding it is clearly stated in Bigelow on Estoppel (6th Ed.), pp. 597 and 746, as follows:

"A similar rule of law applies to employees and contracting parties generally; they cannot accept the benefits of the contract and yet, when called upon to perform their duties under it, repudiate it as made without right, or as otherwise wanting in force, if it is not actually in violation of law, or wholly void."

"Though a contract be in fact wholly *invalid* when executed, still (supposing it not to be prohibited by law as relating to some illegal transaction), if it be acted upon afterwards by the parties to it as valid, they will, if *sui juris,* be estopped thereafter to allege its invalidity."

In 21 C. J. p. 1209, it is said:

"One of the most familiar applications of the rule relating to the acceptance of benefits arises in the case of contracts. It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the existence, validity, and effect of a contract."

The effect of the receipt and retention of benefits under a voidable contract is well illustrated in *Foster* v. *Rowley,* 110 Mich. 63. See, also, *Hamburger* v. *Berman,* 203 Mich. 78.

The holding in *Sparrow* v. *E. Bement & Sons,* 142

Mich. 441 (10 L. R. A. [N. S.] 725), is, I think, in no way decisive of the question here presented. It involved the action of the old Bement company in transferring its assets to a new company and the right of the plaintiff as a stockholder in the old company to participate therein. This court held that "the two companies were identical so far as the rights of complainant are concerned," and ordered the issue to him of preferred stock in the new company of the value of that held by him in the old company.

The order of the circuit court denying the motion to dismiss should be affirmed, with costs to appellees.

WIEST, J. I concur in the result announced in the opinion of Mr. Justice SHARPE.

I want to know more about the facts, to be informed of the number and real interests of the excluded stockholders, the extent of the injury, if any, suffered by them, their desires in the premises, and whether equity, under proofs taken, can work out their protection in an enforcement against defendants and full command of what plaintiffs must do in their behalf. Defendants were not spokesmen for such stockholders when the contract was made, and their solicitude now about their rights, while belated, may, under proofs, enable the court of equity to do equity to all persons interested.

The large amount involved, the importance of a right decision to everyone interested, and the uncertainty and possible confusion and invitation to future litigation which would follow a holding, upon mere pleadings, that the contract is void, leads me to the view that the demurrer should be overruled, with liberty to defendants to insist upon the same defense, by answer, and to send the issue to proofs.

CLARK, J., concurred with WIEST, J.