### CURTISS v. WILMARTH.

1. CORPORATIONS—SUIT BY STOCKHOLDERS AGAINST DIRECTORS—EVIDENCE.

In a suit by stockholders against directors of a corporation on the ground of fraudulent representations in the sale of stock, and, by amended bill, for fraudulent and negligent misconduct in conducting the corporation's business, elimination of proof of said fraudulent representations, *held*, justified, in view of prayer for relief in amended bill and statement of plaintiff's counsel as to issues involved in court below.

On the question as to necessity of applying to board of directors as a condition of right of stockholder to sue on behalf of the corporation, see annotation in 51 L. R. A. (N. S.) 99.

2. EVIDENCE—JUDICIAL NOTICE.

Court takes judicial notice that drop in price of products in the fall of 1920 and thereafter was not confined to the business of the company involved in instant case.

3. CORPORATIONS—AMOUNT OF LOSS SUFFERED—NEGLIGENCE OF DIRECTORS.

Finding of court below as to amount of loss sustained by corporation due to failure of certain director to account for corporate stock sold by him, *held,* supported by evidence.

4. SAME—MISCONDUCT OF DIRECTORS.

Finding of court below that no intentional fraud or misconduct is chargeable to defendant directors, *held,* justified by evidence.

5. SAME—BANKRUPTCY—DUTY OF STOCKHOLDERS.

Stockholders having knowledge of facts claimed to show fraudulent and negligent misconduct of directors in conducting corporation's business before discharge of corporation's trustee in bankruptcy, rendering said directors liable to account for money so lost, had duty to present said facts in bankruptcy court so that trustee could have recovered said money and used it for purpose of further satisfying creditors' claims.

6. SAME—DUTY TO PAY CREDITORS.

Stockholders are equally interested with directors in the performance by the corporation of its duty to pay its creditors.

7. SAME—STOCKHOLDERS MAY NOT BENEFIT TO EXCLUSION OF CREDITORS.

Stockholders having knowledge of facts rendering directors liable to corporation for negligence in handling its business may not sit quietly by and allow proceedings in bankruptcy to be concluded whereby creditors receive but a small part of their claims, and thereafter bring suit to recover the money due the corporation by reason of said negligence and themselves benefit thereby to the exclusion of the creditors.

8. SAME—STOCKHOLDERS NOT CREDITORS.

Stockholders are not creditors of corporation as that word is generally understood.

9. SAME—STOCKHOLDERS DO NOT SUE IN OWN RIGHT.

Stockholders do not sue in their own right, but in that of corporation, since cause of action is asset of corporation.

10. SAME—NEGLIGENCE OF DIRECTORS—STOCKHOLDERS' RIGHT TO SUE.

Stockholders may not bring suit on corporation's cause of action unless they have requested directors to bring it in name of corporation, except where brought to recover money lost to corporation through directors' negligence.

11. SAME—INSOLVENCY—ASSETS PASS TO TRUSTEE—RIGHT OF CORPORATION TO SUE.

Since all of the assets of insolvent corporation, including right to recover money lost to it through directors' negligence, passed to trustee in bankruptcy, corporation could not thereafter maintain suit thereon, in absence of claim that trustee was in any way chargeable with negligence complained of.

12. SAME—NECESSARY THAT DEMAND BE MADE ON TRUSTEE TO BRING SUIT BY STOCKHOLDERS.

Where contract was made primarily for benefit of corporation and only indirectly for benefit of stockholders, before latter may prosecute claim based on its breach, after corporation becomes insolvent, demand must first be made on receiver or trustee in bankruptcy to bring suit.

13. SAME—PLEADING—STOCKHOLDER MUST SHOW BENEFIT TO HIM.

Where corporation is insolvent, stockholder may not maintain suit to hold directors liable for fraud unless he alleges that the relief asked for will be of some benefit to him, i. e., that there will be a surplus for stockholders after creditors are paid.

Appeal from Kent; Perkins (Willis B.), J. Submitted January 21, 1931. (Docket No. 116, Calendar No. 34,817.) Decided June 1, 1931. Rehearing denied September 10, 1931.

Bill by James A. Curtiss and others against Oscar B. Wilmarth and others to rescind contracts for the purchase of corporate stock on ground of fraud, and to account for losses of the Grand Rapids Knitting Mills alleged to be due to their fraudulent misconduct and negligent acts as directors of said corporation. Bill dismissed. Plaintiffs appeal. Affirmed.

*McAllister & McAllister,* for plaintiffs.

*Butterfield, Keeney & Amberg,* for defendants Wilmarth, Foote, and Murray.

*Travis, Merrick, Johnson & McCobb,* for defendant Palmer.

Sharpe, J.　In June, 1923, the defendant Grand Rapids Knitting Mills filed a petition in voluntary bankruptcy. The assets of the company were disposed of, from the proceeds of which the unsecured creditors received payment of 22.14 per cent. of their claims. The trustee filed his final account, and was discharged on December 2, 1924.

On February 21, 1925, a large number of the stockholders filed the bill of complaint herein, alleging that they had been induced to purchase their stock by the fraudulent representations of the individual defendants, the then board of directors of the company, and praying for a rescission of their contracts of purchase and the payment to them by the individual defendants of the moneys paid by them thereon. The defendants, except Mather and Case, who were not served with process, appeared and answered, denying the material allegations in the bill.

On April 16, 1927, more than two years thereafter, by order of the court, but against the objection of the defendants, an amended bill of complaint was filed. It contained many of the allegations of the former bill, but particularly set forth that, by mismanagement and neglect of their duty as such directors, the individual defendants permitted the moneys which had been received by the sale of certain of its stock "to be squandered, misappropriated

and lost," and that the financial ruin of the company had been produced and it forced into bankruptcy thereby. They prayed for a decree adjudging the individual defendants liable for the losses so incurred, and for the appointment of a receiver to collect the same and disburse the sums so received.

The defendants, except Mather and Case, who are hereafter called the defendants, answered the amended bill, denying the material allegations therein. The proofs were submitted in open court, after which the trial court entered a decree dismissing the bill of complaint, from which the plaintiffs have taken an appeal.

The trial court filed a written opinion, in which he reviewed the proofs and the claims of counsel at considerable length. In it he said that the claim of plaintiffs' counsel, as stated in their final brief filed with him, was as follows:

"The parties to this suit are agreed that the question to be adjudicated is what damage did the corporation suffer from the acts of the directors, what is the damage to the corporation, and what are the facts of negligence of the directors."

He eliminated a very considerable part of the proofs submitted as immaterial to the question as above presented. This included that tending to support the claim of the fraudulent representations which induced plaintiffs to purchase their stock and the earnings and losses of the company prior to such purchase. It appeared that one of the directors, Carl N. Mather, had been intrusted with the sale of certain stock authorized to be issued by the securities commission, and the trial court limited the issue to—

"whether these defendants were guilty of negligence in permitting Mather to become indebted to the company in the sum of approximately $60,000."

While counsel in their brief filed in this court discuss at considerable length the effect of the proofs thus eliminated from consideration by the trial court, we are of the opinion that the prayer for relief in the amended bill and the statement of counsel above quoted fully justified such action on his part.

After a consideration of the pleadings and the material proofs submitted, the trial court said:

"The real issue in this cause in its last analysis relates to the responsibility, if any, of the four defendants, Foote, Wilmarth, Murray and Palmer for loss to the corporation due to Mather's failure to pay to the company all he owed as a result of the sale of the company's stock to him."

To understand how this sale came about, it seems necessary to detail at some length the history of the company. It apparently was in a fairly prosperous condition in the fall of 1920, but from that time on there was a steady drop in the prices of its products. We may take judicial notice that this period of deflation was not confined to the business of this company alone. It lost money on practically everything it handled for a period of months. In the spring of 1921 there were signs of improvement, and the board of directors caused an audit to be made in order to ascertain its exact financial condition. The report of the auditors and an independent appraisal of the value of the company's property revealed the fact that on June 30, 1921, its assets and liabilities were about the same. It then had a paid-in capital of $79,100, but no funds with which to do business.

At a meeting of the board of directors on May 28, 1921, at which Case, Mather, Murray, and Palmer were present, a tentative balance sheet, prepared by the auditors, was presented. A proposition of certain fiscal agents for increase and sale of capital stock was presented and discussed, and Case, Mather, and Palmer were appointed a committee to consult with the bank and fiscal agents and to make recommendation to a special meeting of the stockholders to be thereafter called. Such meeting was held on July 5, 1921, at which it was decided to change the name of the corporation from Mather-Palmer Company to Grand Rapids Knitting Mills; to increase the capital stock to $400,000 of preferred and 300,000 shares of no-par value. The directors were authorized to secure permission for such increase from the Michigan securities commission. Fifteen per cent. was fixed as the commission to be allowed on the sale of the stock. At this meeting, the holders of 4,200 shares of stock out of 4,910 outstanding were present or represented.

On July 14th, the securities commission validated both preferred and no-par stock and authorized the sale of $100,000 of common stock and $100,000 of preferred stock on condition that not to exceed 15 per cent. commission be paid on the sale thereof. The sale of the stock was considered at a meeting of the stockholders on July 18th, and a proposition of director Mather to underwrite it was submitted and recommended for approval to the board of directors. A by-law of the corporation was amended to authorize the treasurer to sign the certificates instead of the president. Later, on the same day, the board of directors met and the following action was taken:

"The minutes of the annual meeting of the stockholders of July 18th were read and upon discussion

it was unanimously moved, seconded and carried that Messrs. Case, Mather and Palmer be authorized to arrange for a sale of the no-par value stock of the company through C. N. Mather as broker as recommended in such stockholders' meeting with power on the part of Case, Mather and Palmer to take such action as shall be necessary to consummate such arrangement.''

On July 23, 1921, a written agreement was entered into between the company and Mather, wherein the company agreed to sell to Mather all of the stock which had been validated by the commission ''in such amounts as said second party shall from time to time order or demand from said first party'' at the price of $10 per share for the preferred stock and a sum to be agreed upon, to be evidenced by a supplementary contract, for the no-par value stock. It was provided therein:

''It is further agreed that said second party shall acquire a broker's license and dispose of any stock so purchased by him in his discretion.''

In an agreement supplemental to this, which was lost, but proof of which was submitted, the price of the no-par stock was fixed at $2 per share, from which Mather was entitled to deduct a 15 per cent. commission. He secured a license as a broker, and proceeded to sell this no-par stock; $8,500 worth was delivered to him and his note for that amount placed in the hands of the treasurer. He engaged the services of other brokers and salesmen in disposing of it and of other stock which came into his hands for sale, being that of stockholders, some of whom had been permitted to exchange their common stock for no-par stock, with the result that in June, 1923, when the company was adjudged a bankrupt, Mather also became such. The manner in which he

was permitted to dispose of the stock of the company, without paying in cash therefor, forms the basis on which the plaintiffs' claim of negligence on the part of the defendants rests.

Counsel differ widely as to the amount of the company's stock sold by Mather, or by others acting for him. While some of the records which would doubtless more clearly show the exact amount are now lost, we think it quite satisfactorily appears that the proceeds thereof to which the company was entitled, less the money paid by him into the treasury of the company, $44,876.48, amount approximately to the sum of $61,187.44. In the Mather bankruptcy proceeding, the referee allowed the claim of the trustee in bankruptcy of the company against Mather at the sum of $61,189.49, of which $305.95 was paid out of the bankruptcy assets, leaving a balance of $60,883.54.

Counsel for plaintiffs insist that the amount of Mather's indebtedness was largely in excess of the sum stated. Irrespective of the contention of defendants that the determination in the bankruptcy proceedings is *res adjudicata,* we are satisfied that the amount fixed fairly represented the amount of such indebtedness. It also appears to be the amount which one of plaintiffs' auditors found to be due from Mather to the company.

The trial court found:

"The ultimate failure of the corporation was not due to Mather's inability to pay his account. In spite of $44,000 or thereabouts, paid into the company on new stock sales, the losses in retail and wholesale selling of merchandise were so great, due to adverse business conditions, as to make further operations impossible. The payment of Mather's entire debt would have been barely sufficient to

·satisfy existing creditors and ultimate failure must have occurred in any event.''

The evidence supports this finding. It appears that the operating end of the company's business received attention from the directors. Its financial failure was due to causes which they were unable to control.

The trial court was of the opinion that, under the proofs submitted, the defendants could not ''be held responsible for the unpaid debt of Mather. There is nothing in this case indicating such nonfeasance or misfeasance of these defendant directors as should make them personally responsible therefor.'' While defendants' counsel strenuously insist that the conclusion thus reached is supported by the evidence and the law applicable to the conduct of directors of a mercantile corporation, we are unwilling to rest decision thereon. We are, however, in accord with the finding that no intentional fraud or misconduct is chargeable to the defendants.

This suit cannot be considered as other than one by the plaintiffs, representing the corporation, to compel the defendants to pay into the treasury of the company certain moneys lost to it by their negligence in the conduct of its affairs. The material facts here presented were known to many of the plaintiffs before the discharge of the trustee in bankruptcy on December 2, 1924. They had held meetings and made arrangements with attorneys for the bringing of this suit as early as October, 1924. The bill of complaint was filed on February 21, 1925. It was their duty to have presented these facts in the bankruptcy court, in an effort to have the liability of the defendants there established, to the end that money would have come into the hands of the trustee

with which to further satisfy the claims of the creditors. Their counsel now say:

"In this case there was no trustee in bankruptcy at the time that the plaintiffs discovered this fraud and instituted this suit. The estate of the Grand Rapids Knitting Mills was entirely closed and the trustee was discharged of his trust, and his bond as trustee canceled December 2, 1924,"—

and insist that the plaintiffs who have instituted this suit "are the only ones entitled to the avails."

A duty rests upon every corporation to pay its creditors. In its performance, the stockholders, while they may not be personally liable for the debts of the corporation, are equally interested with the directors whom they have chosen to manage its affairs. It would be a strange doctrine for a court to announce a rule that certain stockholders, having knowledge of facts which render the directors liable to the corporation for negligence in the handling of its fiscal affairs, may sit quietly by and allow proceedings in bankruptcy to be carried on and the assets of the corporation disposed of, under which the creditors receive but a small percentage of their claims as allowed, and, after the discharge of the trustee, institute a suit to recover money due the corporation from the directors on account of such negligence and be themselves entitled to the sums so recovered to the exclusion of the claims of the creditors.

Stockholders are not creditors of the corporation as that word is generally understood. *Leland* v. *Ford,* 245 Mich. 599. In a stockholders' suit, they do not sue in their own right, but in that of the corporation. The cause of action is an asset of the corporation, and, as a general rule, a stockholder

may not bring suit unless he has requested the directors to bring it in the name of the corporation. There is an exception to this rule, as here, when the suit is brought to recover moneys lost to the corporation through the negligence of the directors. But, in this case, all of the assets of the corporation passed to the trustee in bankruptcy. The corporation could not thereafter maintain a suit. Its assets, including all rights of action, were in the hands of the trustee as an officer of the court. Had the plaintiffs furnished him with information justifying action against the defendants, on his refusal to prosecute the same, recourse might have been had to the court to compel such action on his part. But the law will not permit the plaintiffs to quietly sit by and permit the trustee to close the bankrupt estate, paying to the creditors but a small percentage of their claims, and, after his discharge, bring suit for their own benefit to recover from the directors moneys due the corporation.

No claim is made that the trustee was himself in any way chargeable with the negligence complained of, as was the case in *Flynn* v. *Third National Bank,* 122 Mich. 642, relied on by plaintiffs' counsel.

"A demand on the corporation need not be made where the corporate functions have been suspended by the appointment of a receiver since its power to sue no longer exists. In cases where the corporation is in the hands of a receiver or trustee in insolvency, the demand must be made on this official." 6 Thompson on Corporations (3d Ed.), p. 486.

A suit by a stockholder is in fact a suit by the corporation to redress a wrong to the corporation, and the relief granted belongs to the corporation and not to the stockholder individually. He is not

entitled to the money recovered. That goes to the corporation, and not to the individual complainants. 6 Thompson on Corporations (3d Ed.), p. 465.

In *Talbot* v. *Scripps,* 31 Mich. 268, in which an action was brought by a stockholder against individuals, who, it was alleged, had conspired with the directors to wreck the corporation, it was said:

"The wrong alleged will be seen to be a corporate wrong, in which all the stockholders are proportionally interested, and any legal redress should be at the instance of the corporation, if the board of directors will consent to demand it. There is no allegation that the board has been requested to bring suit and has refused. Under these circumstances, we know of no ground on which the suit can be maintained. As well might an individual stockholder bring suit to recover his share of corporate funds which had been lost by negligence or embezzlement, or his proportion of insurance money on the corporate property destroyed by fire. The injury counted on is not a separate injury to each of the stockholders, but a joint injury to all, and the corporation represents all for the purposes of legal remedy; at least until it is shown that the corporate authorities refuse after proper application to act."

The above holding was referred to with approval in *Horning* v. *Louis Peters & Co.,* 202 Mich. 140, 151, where it was said:

"The contract, then, having been made primarily for the benefit of the corporation and only secondarily or indirectly for the benefit of its stockholders, such stockholders including plaintiff cannot prosecute a claim based upon its breach without first making a demand upon the receiver (in this case the trustee in bankruptcy), to commence suit."

In 4 Cook on Corporations (8th Ed.), p. 3202, it is said:

"Another important principle of law in this connection is that where the corporation is insolvent a stockholder cannot maintain a suit to hold the directors liable for fraud unless he alleges that the relief asked for will be of some benefit to him; in other words, that there will be a surplus for the stockholders after the creditors are paid."

The decree dismissing the bill is affirmed, with costs to appellees.

BUTZEL, C. J., and WIEST, CLARK, McDONALD, POTTER, NORTH, and FEAD, JJ., concurred.